(No. 12308.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. EDGAR A. STRAUSE, Plaintiff in Error.

*Opinion filed December 17, 1919.*

1. CRIMINAL LAW—*jury is not bound to believe defendant's testimony.* Where the defendant is the only person to testify to the actual facts of the homicide with which he is charged, the fact that he has not been contradicted by anyone does not necessarily require the jury to believe his testimony, as his story may be so improbable as to justify the jury in disregarding it or it may be contradicted by the facts and circumstantial evidence.

2. SAME—*affidavit of a juror cannot be received to set aside his verdict.* The affidavit of a juror cannot be received to impeach or set aside his verdict and is not properly admissible in support of a motion for a new trial and to set aside the verdict for the misconduct of the jurors.

3. SAME—*fact that jury passed by the place of the crime does not vitiate their verdict.* The fact that the jury, contrary to the directions of the court to the bailiffs, were taken past the building where the crime was committed, while they were out for an automobile ride, is not ground for setting aside their verdict.

4. SAME—*misconduct of jurors, if prejudicial, is gound for new trial.* Misconduct on the part of the jury which is clearly prejudicial to the accused or which improperly influences the jury and is not caused or waived by the accused is ground for setting aside a conviction and granting a new trial.

5. SAME—*whether misconduct of jurors was prejudicial must be determined largely by trial court.* On a motion for new trial because of the misconduct of the jurors during the trial of a criminal case, the question whether the misconduct was prejudicial to the accused must be determined largely by the trial court.

6. SAME—*evidence tending to show motive is admissible.* In a trial for murder, evidence which tends in any way to show motive on the part of the accused or will fairly tend to explain his actions should be admitted.

7. SAME—*when evidence is not relevant to the issue:* On the trial of a person for an unwitnessed homicide, which he claims he committed in self-defense after he had accused the other party of certain improper business transactions, letters and papers which the accused claims are sufficient to substantiate the justice of his accusation are not admissible, as they would tend merely to raise collateral issues.

8. SAME—*theory of self-defense should not be ignored in instructions.* Where the defendant in a murder trial rests his case solely on the theory of self-defense, instructions should not be given which might lead the jury to believe that they may ignore the theory of self-defense in arriving at their verdict.

9. SAME—*when instruction defining malice aforethought is misleading.* In a murder trial where self-defense is relied upon, an instruction is misleading which states that "the deliberate intention called malice aforethought need only be such deliberation and thought as enables a person to appreciate and understand, at the time the act was committed, the nature of his act and its probable result."

10. SAME—*giving a correct instruction does not cure error of an incorrect one.* It is sufficient if all the instructions given, considered together, fully and fairly announce the rules of law applicable to the theory of the prosecution and of the defense, but it does not follow that the giving of a correct instruction cures the error of an incorrect one, as it is impossible to tell which the jury will follow.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. ROBERT J. GRIER, Judge, presiding.

JOSEPH A. WEIL, HARRY S. MILLER, and FRANK J. QUINN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, C. E. McNEMAR, State's Attorney, CHARLES F. MANSFIELD, and GEORGE A. SHURTLEFF, for the People.

Per CURIAM: Plaintiff in error, Edgar A. Strause, was indicted by the grand jury of Peoria county for the murder of Berne M. Mead. He plead not guilty to the charge, was tried by jury, found guilty of murder and his punishment fixed at imprisonment in the penitentiary for twenty-five years. He has sued out this writ of error to review the record.

Plaintiff in error admitted on the trial that he shot and killed Mead on Sunday, December 23, 1917, but claimed that he did this act solely in self-defense. Plaintiff in error

was at first a director of the State Trust and Savings Bank a few years and then was elected its president in 1909. He testified that at that time the bank needed a cashier, and, knowing Mead personally, he made arrangements for Mead to take the position of cashier, and for about ten years prior to the homicide he had served as president and Mead as cashier of the bank. The record shows that their relations in all these years had been friendly,—at least until some three weeks before the homicide. Plaintiff in error was forty-seven years old and had resided in Peoria twenty-five years. His wife was dead, but he had three sons, aged, respectively, twenty-one, twenty and fourteen years, all three of them being away from home, attending school. One of the sons came home for the holidays, accompanied by two of his school friends. Shortly after eleven o'clock on the Sunday morning in question plaintiff in error went from his residence in an automobile driven by his son, to the Jefferson Hotel, in Peoria, where he met some acquaintances and chatted with them a few moments and arranged to play cards in the afternoon. He then went directly across Jefferson street to the bank of which he was president, which stands on the corner of Jefferson and Liberty streets. Jefferson street runs parallel with the Illinois river, in a northeasterly and southwesterly direction, and is crossed at right angles by Liberty street. The State Trust and Savings Bank is at the corner of Jefferson and Liberty streets. The next street towards the river running parallel with Jefferson street is Adams street. The next street in a northerly direction from Liberty street and running parallel with said street is Fulton. The entrance to the bank is through double doors on Jefferson street, each door having a glass panel 19½ inches wide. The bank building fronts about 48 feet on Jefferson street and extends along Liberty street about 90 feet. The front of the bank on either side of the double doors is principally plate glass, divided into two windows on each side. On the Liberty street side of the bank,

near Jefferson street, are two wide glass windows. Just
beyond the one furthest from Jefferson street is a railing,
composed of iron pipes, to protect the public from falling
into an open areaway and stairways leading to the basement.
The top of the window sill directly over where these iron
pipes are attached to the wall is 43½ inches above the side-
walk. Inside the window is a narrow sliding curtain at-
tached to rings on a horizontal pole, the pole being about
64 inches above the sidewalk. After passing through the
vestibule of the bank and through the second set of doors
one enters the public lobby of the bank, which is 18 feet
wide and about 40 feet long. Immediately on the left side
of the vestibule as one enters the bank is the room occu-
pied by the plaintiff in error as president of the bank, the
southerly wall of that room being the northerly wall of the
vestibule and composed of a marble partition about 3½ feet
high, above which is a partition made of small panes of
beveled glass, through which it is difficult to see. On the
left side of the lobby, immediately after one enters the bank
from the front, is the cashier's room which was used by
Mead, and is separated from the lobby by a marble-top rail-
ing or counter about three feet high, and is entered by a
swinging gate very close to the entrance to plaintiff in er-
ror's room, which latter room is between Mead's room and
the front of the bank. The president's room is separated
from the lobby by a rail or counter a little higher and of
the same material as that separating Mead's room from the
lobby. On Jefferson street, at the corner of the bank build-
ing nearest to Fulton street, is a stairway to a business col-
lege on the upper floors of the bank building. Between this
stairway and plaintiff in error's room and between Mead's
room and Jefferson street is a small inclosed room which
is used by the bank officials for consultation. There is a
door opening from this room into plaintiff in error's room
which was usually kept closed, also one opening into Mead's
room which was usually open, except when someone was in

the room for consultation. On the left side of the lobby and extending from the back of Mead's room towards the rear of the bank are four cages surrounded by wire lattice work, occupied by bank employees in transacting business with the public. These cages front the bank lobby, and their front is on a line with the railing or counter separating Mead's room from the lobby. Between the rear of these cages and the wall of the bank building is a space about 10 feet wide, which is entered by a door from Mead's room and extends back towards the rear of the building. Immediately beyond the last cage is a corridor extending towards Liberty street, separating the rear of the bank lobby from the vault farther towards the rear. A doorway leads from this last hall or space into the directors' room, which is in the rear of the lobby on the Liberty street side. There is also an entrance from the space back of the cages at the left side of the vault, looking toward the back of the bank, into a hallway towards Adams street, and this hallway connects with the directors' room and also with the janitor's room and toilets. On the Liberty street side of the lobby, opposite the cages, are several rooms separated from the lobby by partitions or counters and used by the bank employees,—book-keepers and others,—in the work of the bank. Some of these rooms open into the lobby without any partitions between them except a low marble counter, so that under favorable circumstances a person can look from Liberty street through the windows and see into and across the lobby.

The evidence shows that shortly after eleven o'clock the deceased, Mead, entered the bank. Before doing so he had visited the Creve Cœur Club, which is immediately across Liberty street from the bank, and was seen by several people just before he left to cross Liberty street and enter the bank. The evidence shows also that about 11:30 o'clock plaintiff in error entered the bank. Shortly thereafter a shot was fired inside of the bank, which was heard by several

persons who were in that neighborhood at the time,—Farin Hogan, a country boy about twelve years of age, who was on Liberty street between the bank building and the club; Franklin and Draper, who were also near the bank corner; Schaeffer, who was on Liberty street not far from Jefferson street; an elderly lady, Mrs. Sweeney, who was crossing the street near the bank, and a few others who were also in the vicinity. Shortly after this shot was fired some of these witnesses heard cries or groans in the bank, which most of them said sounded like "Oh! Oh! Oh!" and Mrs. Sweeney stated it sounded like "Uh!" One of the witnesses answered, on cross-examination by counsel for plaintiff in error, that he could not tell whether the cry was "Oh! Oh! Oh!" or "No! No! No!" or "Don't! Don't! Don't!" Immediately after this shot was fired some of the witnesses went to the door and windows in front of the bank and tried to look in and see what was taking place. Some of them pounded or rattled the door, which was locked. One of the witnesses testified that while he was standing at the door plaintiff in error walked up to the door from the inside, put his hand up to the keyhole, then turned and went back into the bank; that shortly thereafter,—perhaps about two or three minutes,—two more shots were fired in rapid succession. The boy, Farin Hogan, was on Liberty street next to the bank at the time the first shot was fired. He did not know at first what the sound was,—thought possibly it was the explosion of an automobile tire; that just about that time a man came to the window in the second room from the front of the bank and looked out towards Liberty street and then went back across the lobby of the bank to the other side. He testified that immediately after he saw this man come to the window, witness climbed onto the iron railing and looked into the window and from this point saw the man cross the bank lobby and go into Mead's room. As we understand his testimony, Hogan got down from the railing shortly and was standing on the sidewalk when he

heard two shots fired in quick succession within the bank.
Then he climbed upon the railing again to look into the
bank. He testified that he saw smoke beyond the cages and
somebody stooping down near the table in Mead's room,
with his back towards the window through which witness
was looking; that shortly after the man rose up and seemed
to go into the space back of the cages; that a little while
later he went to the front door with his hands in his pock-
ets. He testified that this man whom he saw go to the
door, and who had theretofore come to the window, was
plaintiff in error; that when he first saw him at the win-
dow on the Liberty street side of the bank there was no
disarrangement of his collar or clothing but when he saw
him go to the door later his collar was unbuttoned. Sev-
eral of the witnesses who looked in through the windows
immediately adjoining the front doors on Jefferson street
testified that they could see a part of the space in Strause's
room and also in Mead's room, some of them testifying
that they could see at least two-thirds, longitudinally, of
the table or desk situated in the center of Mead's room and
most of the entire width of the cage back of Mead's room,
and that they saw no one at any time in either of these
rooms, although some of them testified they saw plaintiff
in error come from Mead's room or the lobby to the front
entrance and let in police officer Couch some minutes after
the last two shots were fired within the bank. All the wit-
nesses who were around the bank testified that the second
and third shots were fired in the bank,—some of them did
not know in what part,—and others testified that the shots
were from the back part of the bank.

Two tailors conducted a clothes cleaning and pressing
establishment in the basement under the rear of the bank.
They stated that they were in their place of business Sun-
day morning, December 23, and between eleven and twelve
o'clock they heard sounds of feet in the bank above, which
appeared as if there was scuffling going on; that about the

same time they heard a shot fired; that they both left their place and went up-stairs onto the Liberty street sidewalk, and a short time afterwards they heard two more shots fired in quick succession. Mrs. Sweeney also testified that after the two shots were fired she heard what she thought sounded like a body slipping or falling to the floor.

While the shooting took place in the bank someone notified the police authorities, and police officer Couch came in an automobile about seven or eight minutes after the shots were fired. He went to the front door on Jefferson street and rattled it and plaintiff in error let him in. The officer inquired what was the matter, and plaintiff in error said he had some trouble with one of the men,—"He got me first." This police officer was admitted to the bank about 11:45 o'clock. He was not told by plaintiff in error that Mead was shot until after the officer had seen the body of Mead lying behind the two middle cages. Shortly after officer Couch was let in officer Claudin came to the door, and on the direction of officer Couch plaintiff in error let him into the bank. Officer Claudin asked him, "What is the trouble?" and the answer was, "I had some trouble with the cashier." Upon being asked what the trouble was, he said, "Me and my cashier had trouble and he tried to get me; I got him first," or, "I shot him." On entering the bank these officers found no one there but plaintiff in error and the body of Mead. Mead's chair was in its usual place on the side of his desk opposite from the door opening from the lobby into his room. When asked by one of the officers where his gun was, plaintiff in error directed him to where it was lying on a table in the rear of the cages. They found no injuries or scratches of any kind on plaintiff in error's person, but they observed a blood spot on his right hand and another on his vest, and a smutty spot, not of blood, on his collar. Dr. Weil, a physician, was immediately called and came in shortly thereafter and found that Mead was dead. The officers found the collar of plaintiff

in error disarranged, and with their assistance he fixed his collar and necktie. On the inside of his collar there was a mark of a finger-print, which, it is conceded by his counsel, was the print of one of the fingers from Strause's right hand.

An examination of the bank by the officers and others disclosed that a bullet had entered the wall in the partition farthest away from the bank lobby, immediately back of the rear end of Mead's desk, about two inches to the left of where the edge of the door came when open from Mead's room to the space back of the cages. This bullet had entered the wall about the height of a man's head if sitting in a chair. The testimony tends to show that it entered the wall at an angle as if fired from the direction of Jefferson street, angling towards the rear of the bank. The evidence also tends to show that there were some blood specks, very small, around this bullet hole, and that small bits of flesh or muscle tissue were found on the edge of the door just adjoining or near the bullet hole and a small blood speck was found upon the floor near Mead's desk. Along the Fulton street wall of the bank, in the space back of the cages, after passing through the door from Mead's room, were several articles of furniture, among others a filing case for letters, a typewriter desk and another steel filing case. The officers found on examining the bank, after passing through the door from Mead's room into this space, that there was blood on this door jamb and along the wall and on the articles of furniture, including the filing cases, next to the Fulton street wall, and on the floor about where Mead's body lay there were large pools of blood. They also found a nickel-plated revolver lying on the floor near Mead's right hand and a portion of his glasses or spectacles. They also found a second bullet buried in the Fulton street wall of the bank, about opposite where Mead's body lay and about seven feet above the floor. A mark on the wall farther back towards the rear, higher up from the floor, indicated that the third bullet had struck there and glanced off

and hit the steel vault in the rear of the building. This bullet was found on the floor near the vault. The second bullet which struck the wall near Mead's body was dug out of the wall. All three of these bullets were offered in evidence by the State. The evidence shows that one of them had been fired from the Smith & Wesson nickel-plated revolver and the other two had been fired from the Colt revolver. The testimony tended to show that some of the blood marks on the wall had the appearance of having been made with a bloody hand. Two revolvers were found in the bank—one a nickel-plated Smith & Wesson revolver and the other a blue-steel Colt revolver. The nickel-plated one that was found near Mead's right hand was picked up by Dr. Weil when he examined the body, and it was found that one of the cartridges had been exploded.

On the post-mortem examination held on Mead's body the Sunday evening of his death it was found that one bullet had entered the right temple and passed down through the lower left eyelid. Another bullet had entered the lip below the right nostril and came out at the back of the neck two inches to the left of the median line. Mead wore glasses. The left lens was broken. A piece of it was found in the left-hand drawer of his desk.

No one saw the homicide except plaintiff in error and the deceased. The only direct testimony as to how the tragedy occurred is that of the accused. He testified that about three weeks before the shooting Mead told him that some of his friends contemplated organizing a bank in Peoria with $400,000 capital and wanted Mead to be president of it, and had also suggested to him the re-organization of the State Trust and Savings Bank with $400,000 capital stock. At that time the capital stock of this bank was $200,000, of which the testimony shows Mead owned about 300 shares and plaintiff in error 150 shares, and also that each of them perhaps controlled some additional shares. Plaintiff in error testified that in the conversation about

re-organizing with increased capital Mead asked him if he would sell his stock. He replied that he had never thought about selling; that when he took the management as president the bank was in bad condition; that he had sacrificed a great deal, both in time and money, in building the institution up to where it was, and now, when it had reached the point where it had the confidence of the community and where it was recognized as a success, he didn't know what to say about selling the stock; that Mead said the proposed re-organization would be a big thing for him (Mead) and offered accused $200 per share for his stock; that plaintiff in error replied that that was more than it was worth, the book value of the stock being about $145; that Mead said he knew that, but the proposition of re-organization meant so much to him that he was willing to give that price to plaintiff in error. The evidence shows that plaintiff in error then owned and conducted six cigar stores in Peoria. Plaintiff in error further testified that Mead told him that he (plaintiff in error) had other business he could give his attention to, and that he replied that he had not for years taken an active part in the management of his other business but had devoted practically all his time and efforts to the bank; that after considerable more talk about the matter Mead asked him when he could give him an answer, and he promised he would do so the latter part of the week; that Mead inquired as to the proposition in the following week, and plaintiff in error told him there were a number of things he had to consider,—one of them, that at his personal solicitation a number of men had invested their money in the bank stock and that he would not feel like selling his stock at the price offered unless these men were given an opportunity to sell on the same basis; that Mead said he could not do that,—that he was not interested in the other stock,—and then offered to pay plaintiff in error $220 a share for his stock; that he asked plaintiff in error to think the matter over for a day or two and let him know, as he

wanted some time to raise the money; that the matter was not mentioned again until the morning of the homicide.

Plaintiff in error testified that about a week or two before the homicide he discovered that the deceased was engaged in some transactions in connection with the bank which in his judgment were not legitimate banking transactions; that Mead and his father-in-law were dealing in United States Steel Company stock on margins, with funds drawn out of the bank on the notes of the father-in-law; that the notes read six per cent interest, but that Mead had written a letter to his father-in-law that they could be paid on a basis of five per cent; that plaintiff in error had discovered these facts from a carbon copy of a letter on file, written by Mead to his father-in-law; that Mead was also a stockholder in the Pinkerton Motor Company of Peoria, and that plaintiff in error had discovered that he had been permitting that company to take from the bank the bills of lading the bank had received, with drafts attached, without requiring the drafts to be first paid and only taking in payment of the drafts checks of the Pinkerton Motor Company. Plaintiff in error testified that he had found that Mead would release the bill of lading to the motor company, take its check and pin it to the draft and carry the check; that the week before the homicide there were thirteen such checks pinned to drafts where the bills of lading had been released, amounting to some $5000 or $6000; that some year and a half before the homicide Mead and plaintiff in error had bought from brokers in Oklahoma some notes secured by mortgages on land in that State; that they borrowed the money to pay for them from the First National Bank of Peoria and put up the Oklahoma notes and mortgages as security; that one of these mortgages was called the Gamblin loan; that plaintiff in error and Mead had objected to some informality in the execution of the mortgage, and the Oklahoma brokers had sent a draft for $1377.60 to take up the Gamblin note and mortgage,

the draft being payable to the State Trust and Savings
Bank, the brokers requesting the return of the Gamblin
papers to them.   Plaintiff in error testified that Mead col-
lected this draft by having issued to himself a cashier's
check of the State Trust and Savings Bank, and the Gam-
blin papers were still in the possession of the First National
Bank as a part of the collateral to secure the loan and re-
mained there for more than a year; that later the Okla-
homa brokers had sent another mortgage for the same
amount as the Gamblin loan and wrote to the State Trust
and Savings Bank, with whom they apparently thought they
were dealing directly, giving it an option of taking it and
returning the draft and the Gamblin loan; that Mead had
placed the new mortgage, with the correspondence, in one
of the boxes of the bank, and plaintiff in error had not dis-
covered until a week before the homicide that the bank had
received the money to take up the Gamblin loan, although
the money for this had been received by Mead more than
a year before.

   Plaintiff in error further testified that because of these
transactions of Mead's, which he deemed irregular and not
good banking, he made up his mind that Mead should be
deposed from the office of cashier; that he had spoken to
two of the directors about the matter and intended to take
the matter up with the entire board and stockholders; that
on the morning of the homicide when he went to the bank
he did not know that anyone else was there; that he went
to prepare advertising for the Christmas savings accounts,
which he had been for some time making a special feature
in the work of the bank; that he unlocked the front doors
on Jefferson street, re-locked the doors and put the keys
in his overcoat pocket, and then went into the bank and
through the swinging door or gate into Mead's room; that
Mead was sitting at his desk; that they exchanged morn-
ing greetings and then plaintiff in error passed through the
corridor back of the cages to the directors' room in the rear

of the bank; that he took off his overcoat and left it, with
the keys in the pocket, in that room; that he had at that
time a Colt's revolver in his pocket, which he also left in
his overcoat pocket in the directors' room; that he then
returned to Mead's room, and after some conversation
about the advertising matter for the Christmas savings ac-
counts plaintiff in error said that he would prepare the copy
for the Monday's advertising; that he started into his
room, which immediately joined Mead's toward the front
of the bank, and Mead asked him what he was going to do
about the proposition to sell his stock; that he replied that
he was not going to do anything; that he would not sell
unless all the stockholders were given an opportunity to sell
on the same basis; that Mead said he was not after their
stock but wanted plaintiff in error's; that he wanted con-
trol of the bank and was going to get it; that plaintiff in
error then told Mead that he wanted his resignation be-
cause he had been doing certain things that were irregular,
and that if he did not get the resignation he would take
the matter up with the directors, and if they didn't sustain
him he would go direct to the stockholders; that he told
Mead of the transactions which he discovered which he
considered objectionable, and that Mead replied that the
charges as to these transactions were not true; that plain-
tiff in error said they were true, and then referred to what
he called gambling in United States Steel Company stock
and the letter to the father-in-law as to the interest rate
on the notes; that Mead replied to this charge that "it was
a damn lie;" that plaintiff in error then stepped to the
letter file in the rear of the cages and took out a copy of
the letter in question that Mead had written to his father-
in-law and put it in his pocket and said to Mead that he
had the evidence and would present it to the board of di-
rectors; that he then started toward the rear of the bank,
when Mead rushed upon him, grabbed him and shoved
him against the steel cabinet next to the Fulton street wall,

about opposite the second cage from the front. The Smith
& Wesson nickel-plated revolver that was found near de-
ceased's right hand was kept for the use of the bank offi-
cials in the second cage, on a shelf below the window which
opened onto the lobby. Plaintiff in error further testified
that as soon as Mead grabbed him he turned and grabbed
Mead by the coat collar; that Mead reached into the sec-
ond cage, which they were back of, and got hold of the
nickel-plated gun and then demanded the copy of the let-
ter; that while they were struggling the revolver was dis-
charged; that plaintiff in error cried out, "Berne! don't!
don't! don't!" that after some scuffling he threw Mead to
the floor near the door to the second cage and ran back to
the directors' room to secure his revolver from his over-
coat and stood there listening and watching for Mead;
that he could not hear or see him and then went cautiously
by the door on the Liberty street side into the lobby; that
his collar was then loose and sticking up and he pushed it
down; that not seeing or hearing Mead he put his gun in
his right trousers' pocket when he had reached the middle
of the lobby and started to the front of the bank and saw
Mead sitting at his desk; that Mead asked him not to leave
and said he wanted to speak to him; that plaintiff in er-
ror continued on to the front, passed through the vestibule
doors, felt for his keys, discovered he did not have them,
and started back; that when he got into the lobby Mead
asked him to come into his office and said he wanted to talk
the matter over with plaintiff in error and fix things up.
Plaintiff in error testified that in response to this request
he stepped into Mead's office from the lobby and stood fac-
ing the end of Mead's desk towards Jefferson street, with
his back to the partition wall between Mead's room and
the conference room; that he then asked Mead what he
wanted to do, and Mead answered, "First, I want that let-
ter;" that plaintiff in error told him he could not have it;
that Mead swore he would have it, whirled in his chair,

290 — 18

pulled the desk drawer at his left open and grabbed a revolver from the drawer; that as Mead raised the gun out of the drawer plaintiff in error fired at him and "ducked" down at the end of the desk and fired again, and then stayed there watching Mead; that Mead got up and went through the doorway into the space in the rear of the cages, where plaintiff in error could hear him moving about; that he saw Mead stumble back from the wall and rushed to him; that just as plaintiff in error reached him Mead threw his hands to his face and sank to the floor; that plaintiff in error ran over to him and called "Berne! Berne!" that just then there was a rattling noise at the front door; that he started to the door, and remembering that he did not have his keys returned to get them, passing through the space at the back of the cages to the directors' room and obtained his keys from his overcoat pocket; that he then went back through the space back of the cages to the front door and saw officer Couch at the door and opened the door and let him in; that he carried away with him in his pocket the copy of the letter written by Mead to his father-in-law, which was offered and received in evidence. Plaintiff in error testified that the reason he came to have the revolver in his overcoat pocket that Sunday when he went to the bank, was because when he made the rounds of his cigar stores on the previous Saturday night he carried the money received from these stores home with him and took the revolver from one of these stores as a protection, intending to return it to the store next day. This, briefly, is the substance of the testimony of the homicide as given by plaintiff in error.

It is argued strenuously by counsel for plaintiff in error that the evidence in the record does not establish the guilt of plaintiff in error beyond a reasonable doubt, and that this court ought to reverse the judgment of the trial court on that account if for no other. We shall not attempt to discuss in detail the various arguments and theories of the

different counsel in this proceeding. A brief reference to some of them, however, may not be out of place, in order that it may be understood that we have taken into consideration all of these different questions in reaching a conclusion on this branch of the case.

It is argued by counsel for plaintiff in error that all of the circumstances as shown by the proof, including the testimony of the boy, Hogan, and the other witnesses who attempted to look through the windows, corroborate the testimony of plaintiff in error as to how the homicide took place. It may be said in this connection that the testimony of the boy does not in every way corroborate that of plaintiff in error, for plaintiff in error contends that he fired the fatal shots while he was standing or stooping near the Jefferson street end of Mead's desk, while the boy testified that just after the shots were fired he saw plaintiff in error stooping over Mead's desk, with his back not towards Jefferson street but toward Liberty street, and that he did not see anyone else in Mead's room at that time.

Counsel for the State argue just as earnestly that the evidence shows conclusively, beyond a reasonable doubt, that plaintiff in error's story as testified to is untrue and that he was the aggressor in the physical conflict which resulted in the death of Mead; that plaintiff in error's story is unreasonable and contradictory in many particulars. They argue from the testimony of expert physicians that the effect of the two wounds received by deceased would be of such a nature as to make it a physical impossibility for Mead to have walked, after they were made, from his chair in his room back into the space behind the cages and for some distance along the wall until he reached the third cage, where he fell and where his body was found. While it is true that some of the physicians testified to that effect, some also testified that it was mere speculation as to how far a man could walk after receiving such wounds. Counsel for the State also argue that if plaintiff in error's story

is true, the blood from the wounds made by the revolver
shots, if Mead had walked the distance that plaintiff in
error testified to, would have saturated his clothing much
farther down his body than it actually did; that the evi-
dence shows that Mead bled profusely, and that only. the
upper parts of his underclothing and the clothing about his
neck were in any way saturated with the blood. The tes-
timony of the physicians is to the effect that the wound
through the forehead would not necessarily have caused his
death; that the wound which entered through the upper
lip was the mortal one, and the State therefore argues that
in view of the facts in this case, considering especially the
blood stains on the articles near the wall in the space back
of the cages, the wound through the forehead must have
been made first, and that before the second was made
through the lip Mead must have walked from his chair
through the door in the rear of his room and along the
wall,. and that the second shot must have been fired behind
the cages,. and they argue in support of this theory that no
witnesses testified that they heard any shots they thought
were from the front of the bank, and that some of the wit-
nesses testified that the second and third shots were fired
from the back part of the bank.

We shall not attempt to discuss in detail or express our
opinion with reference to the conclusion that should be
reached on any of these theories, nor shall we attempt to
reach a conclusion from the evidence as to which one,—the
deceased or plaintiff in error,—was the aggressor in the
conflict that caused Mead's death; or whether the testimony
of plaintiff in error as to the. discussion about the sale of
his stock was more reasonable than the theory contended
for by the State; or whether it was shown from the rec-
ord that Mead was in a situation to control a majority of
the stock and elect a board of directors and become presi-
dent in place of Strause; or whether the story of Strause
is reasonable as to the cause of the shooting being his tak-

ing possession of a copy of a letter which Mead had writ-
ten to the father-in-law, when the testimony of the sten-
ographer who wrote this letter is to the effect that Mead's
private correspondence was not kept in the letter file from
which plaintiff in error testified he obtained this copy but
was kept in Mead's private letter file; or whether his tes-
timony that Mead was so aroused over the taking of this
copy of a letter was unreasonable, in view of the fact that
the stenographer had preserved her shorthand notes and the
evidence shows she had them at the time of the trial.   We
express no conclusion as to the State's contention that Mead
was aware that she kept her notes and would not get into
a mortal conflict with Strause because he would not give
up the copy of the letter when the letter could be easily re-
produced from notes; nor as to the State's claim as to the
impossibility of the truth of plaintiff in error's testimony
that during the first struggle behind the cages Mead reached
over into the second cage and obtained the nickel-plated
Smith & Wesson revolver, which he tried to use; that it
would be an utter impossibility for Mead to obtain this
revolver while he was in such a struggle, in view of the
distance from where it was kept, in the front of the cage,
to the space back of the cages, when they were struggling;
nor as to the reasonableness or unreasonableness of plaintiff
in error's testimony that in this struggle he threw Mead
upon the floor, when the evidence shows that Mead was
physically a larger and stronger man; nor as to the alleged
unreasonableness of the plaintiff in error's testimony as to
his attempt to go back through the bank after he obtained
his pistol from the directors' room, when, if Mead had
made the murderous attempt upon him that he testified to,
he could have telephoned from the directors' room for as-
sistance, or could even have gotten out of the rear of the
bank without in any way jeopardizing his safety.   Neither
do we express any conclusion as to the alleged unreason-

ableness of his testimony that Mead was not shot until after
the struggle back of the cages in which they first engaged,
in the light of the testimony of several witnesses that they
heard moans or cries of someone crying out as if in deep
distress after the first shot was fired; or the alleged unrea-
sonableness of plaintiff in error's testimony in view of the
further fact that the Smith & Wesson nickel-plated revolver
was found within eight or ten inches of the deceased's right
hand, or the contention that such fact would be unbeliev-
able if the story of plaintiff in error is true that Mead, just
before he was shot, took this revolver out of the drawer
in his desk. The State argues that plaintiff in error testi-
fied he struck something with his foot as he went through
the door at the rear of Mead's room after the fatal shoot-
ing and knocked it farther along in the space back of the
cages, and that he thus accounts for the revolver being found
near Mead's body instead of near the rear door of his room.
Neither shall we attempt to argue with reference to the rea-
sonableness or unreasonableness of the theories of counsel
for the State and for plaintiff in error as to the three bul-
lets, and the evidence given by the police officers, which it
is claimed by counsel for plaintiff in error was contradictory
as to these bullets, but which counsel for the State claim
was not contradictory but only seemingly in conflict because
of the misconstruction put upon their testimony by counsel
for plaintiff in error. There is also argument by both coun-
sel as to the apparent unreasonableness and conflict in cer-
tain testimony which we deem it unnecessary to refer to.

Counsel for plaintiff in error rely strongly upon what
they claim the record shows, that plaintiff in error was the
only person to testify to the actual facts as to the homi-
cide and has not been contradicted by anyone, and argue
that therefore the court and jury were bound to believe his
testimony. This does not necessarily follow. (See the rea-
soning of this court on this subject in *People* v. *Morris,* 254
Ill. 559.) Then, too, the jury might have believed,—and

it was their province to pass upon this question,—that the story of plaintiff in error was so improbable as to justify it in being disregarded by them, or that it was contradicted by the facts and circumstantial evidence shown in the record. (*People.* v. *Davis,* 269 Ill. 256, and authorities there cited.) We have given all these matters consideration on this branch of the case in connection with all the other evidence in the record, and have reached the conclusion that these questions were all such that they should be submitted to and passed upon by the jury. We do not express any further opinion as to the evidence except to say that while it was peculiarly of such character that the question of the guilt or innocence should rest with the jury, the rulings of the court on the legal questions involved should have been accurate.

Several other errors are assigned as grounds for reversal of the judgment, among them the action of the trial court in refusing to admit certain evidence, the giving and refusing of instructions, and in denying the motion for new trial on the ground of the misconduct of the jury during the progress of the trial. We shall take up this last question first for consideration.

A large number of affidavits were filed in support of and in opposition to the motion for a new trial because of the misconduct of the jury. Several of these affidavits included those of jurors who swore as to certain alleged misconduct on the part of the jury. These included an affidavit of one McMullen, who was accepted tentatively as a juror after he was examined and remained with the jury in the custody of the sworn officers of the court for several days but was finally excused before the jury was empaneled and did not serve as a juror in the case. For the purposes of this discussion we deem it sufficient to say that the affidavit of McMullen must be considered and treated the same as the affidavits of those jurors who served during the trial.

It has been repeatedly held by this court, commencing with the early decisions of *Forester* v. *Guard,* Breese, 74, and *Browder* v. *Johnson,* id. 96, down to and including *Sanitary District* v. *Cullerton,* 147 Ill. 385, *Marzen* v. *People,* 190 id. 81, *Hayner* v. *People,* 213 id. 142, and many others, that an affidavit of a juror cannot be received to impeach or set aside his verdict. The reason for this conclusion, with a review of numerous authorities, is given at some length in *Sanitary District* v. *Cullerton, supra.* In view of the long line of decisions holding, without variation, that such affidavits are not admissible to impeach the verdict of the jury, even though in certain other jurisdictions conflicting decisions have been reached, we do not deem it necessary to review these decisions at length and see no reason to depart from the conclusions there reached. Beyond question, under the authorities in this State the trial court rightly held that these jurors' affidavits were not properly admissible in support of the motion for a new trial to set aside the verdict for the misconduct of the jurors.

By agreement of counsel on both sides and the consent of the trial court, the jury were permitted, during the progress of the trial, to be taken for automobile rides, but the court instructed the bailiffs in charge not to take the jury past the bank building where the homicide occurred. In taking these rides two automobiles were used, a bailiff riding in each. Upon one occasion while they were out thus riding, they were, in violation of the court's instructions, driven past the bank in question. While there is some conflict in the affidavits as to how rapidly they were going by the bank on that occasion, it is clear that it was very improper, considering the instructions given by the trial court, for the jurors to be taken past the bank contrary to those instructions, but in view of all the facts found in the record on this question we do not think this improper action on the part of the drivers of the automobiles, even though sanctioned by the bailiffs, should require the granting of a new

trial on that ground alone. As a general rule, the mere fact that the jury visited the place of the crime will not vitiate their verdict, without proof that they did so for the purpose of understanding the evidence, or conversed about the case, or something to show a tendency to influence. If a verdict should be set aside merely because of an unauthorized visit by the jury to the place of the crime, without proof of something to show a tendency to prejudice the defendant, then, when the offense was charged to have been committed, for instance, in the business district around the court house square of a county seat, the jury would have to be consigned to a dungeon to consider their verdict, lest they might accidentally see from the court house window some locality mentioned in the testimony. (See *Commonwealth* v. *Fisher*, 134 Am. St. Rep. 1027, 1051, and cases there cited in note.) In this case the record shows that all the jurors were in a general way familiar with the bank building before they were accepted as jurors, some of them testifying on their *voir dire* that they had been in the bank, and all of them stated, as we understand the record, that they had been by the bank and were familiar with the streets and the conditions of the city surrounding the bank building.

Bess Mureen made an affidavit that she was office girl in a dentist's office across the street from the court house yard; that on May 18 she received a postal-card from juror Driscoll and a few days later she received another card; that she replied to the second with a postal-card advertisement for a sanitarium, with a message that he was likely to land there, and every day after that they wrote to each other,—sometimes several times a day; that some of these letters were sent through the mail by both herself and Driscoll and some of them were delivered by messenger. She does not state in her affidavit that anything was ever said in any of these letters by herself or Driscoll with reference to the case, and Driscoll in a counter-affidavit stated positively that nothing was said in any of these letters by him

or Miss Mureen with reference to the case. The two bail-
iffs in charge of the jurors both made affidavits to the
effect that no writing was permitted to go into the jury
room and nothing was allowed to go out that referred in
any way to the case; that they read all the writing that
went to the jurors or was sent out by them. It appears
from the record that not long after the beginning of the
trial counsel for plaintiff in error were consulted by one of
the bailiffs with reference to permitting certain papers sent
by an employer of one of the jurors to be taken to the
juror, and that counsel for plaintiff in error said there was
no objection to it if the bailiff read over such papers and
did not find anything therein referring to the case. It ap-
pears further that when the matter was referred to the
State's attorney he objected to this correspondence from
the employer being sent to the juror and called up the em-
ployer on the telephone, in the presence of the bailiff, and
told him that such papers could not be sent to the juror.
Miss Mureen in her affidavit also stated that she had re-
peatedly from her office seen men and women who were
strangers to her, stop on the sidewalk or in the court house
yard under the windows of the jury room and carry on
conversations with different members of the jury; that she
had seen at least on two occasions a brother of juror Dris-
coll standing on the ground and conversing with that juror
under the window of the jury room. There are also affi-
davits that when a woman was taking pictures in the court
house yard while the jury were in their quarters on the
fourth floor of the building, one of the jurors came to. the
window, and, seeing her thus engaged, requested her to
take their pictures; that they conversed back and forth
with reference to that, and she directed them how to stand
and then took their pictures. A copy of this picture is pre-
sented in the record. This woman also in her affidavit stated
that she had at various times observed persons, both men
and women, under the jury windows conversing with mem-

bers of the jury; that at one time she saw a woman have
a long conversation with a juror. Other persons made affi-
davits to seeing men and women on numerous occasions
on the court house lawn talking to jurors who were in
the windows of the jury room. The proprietor of a cigar
store opposite the court house stated in his affidavit that
on at least fifteen different occasions he saw persons stand-
ing in the court house square, underneath the windows of
the jury room, conversing with the jurors; that on other
occasions he heard jurors call to persons passing on the
street, motioning and beckoning to them. Another affida-
vit was filed to the effect that on one occasion a man, a
woman and a girl came in an automobile, walked to the
court house and stood underneath the window and carried
on a conversation of four or five minutes with some of the
jurors. This affidavit also stated that affiant had seen ju-
rors letting down a string from a window of their quar-
ters on the fourth floor and drawing up the string, appar-
ently with something attached thereto. Another affidavit
stated that affiant had seen a brother of juror Driscoll and
a man named Smythe talking to juror Driscoll from the
ground while the juror stood in a window on the fourth
floor; that Smythe asked the juror, in the hearing of affi-
ant, if they wanted any tobacco or papers; that juror Dris-
coll said no, they had all the tobacco and reading that was
necessary and didn't want anything of that kind, and that
Smythe said if they needed anything to let him know and
he would furnish it. There are also two affidavits to the
effect that persons across the street from the court house
had seen a tall man walking near a certain juror and ap-
parently talking with him on one occasion when the jurors
were on the street in charge of the bailiffs. Apparently the
jurors on these walks always took the same relative posi-
tions in the line, with one of the bailiffs in front and an-
other in the rear of the jurors. The jurors who were in
the position in the line named in these affidavits made affi-

davit that no one had thus talked to them. The bailiffs also filed affidavits that no such action on the part of a tall man with any of the jurors took place. An affidavit was made by the county surveyor on behalf of the State to the effect that the lower sill of the windows on the fourth floor of the court house was a little over 48 feet from the ground, and there were also affidavits to the effect that anyone talking from the ground to the jurors in the fourth story windows would have to talk loud enough so his voice could be heard, even though the language could not be understood, in the offices across the street from the court house yard. There is nothing in any of the affidavits filed in support of the motion for new trial which indicates that anyone heard, during any of these conversations with the jurors from the ground while the jurors stood in the fourth-story windows of the court house, any statements with reference to the case on trial, and the jurors, outside of juror Kircher, all made affidavits that no one from the ground had ever talked with them with reference to the trial, and that none of them had ever heard anyone talking to any of the other jurors with reference to that subject matter. All the counsel for plaintiff in error who took part in the trial of the case filed affidavits to the effect, as did plaintiff in error himself, that they did not know that the jurors were communicating through the fourth-story windows with anyone on the ground until after the verdict was brought in, and that they did not sanction, directly or indirectly, during the trial, such procedure.

Numerous authorities have been cited by counsel on both sides and lengthy arguments made with reference to the rules that should govern as to such communications as heretofore referred to with jurors during the trial of this case. All courts doubtless agree that any misconduct on the part of the jury in a criminal case which was prejudicial to the accused or which improperly influenced the jurors, not caused or waived by the accused, is ground for

setting aside a conviction and granting a new trial. No
doubt the rule is also general that a new trial will not be
granted where it clearly appears that the defendant has not
been injured or prejudiced by the misconduct. The au-
thorities, however, are not in harmony as to the rule as
to presumption of prejudice if there has been any commu-
nication with outside parties, some authorities holding that
if such misconduct might have been prejudicial to defend-
ant, prejudice will be presumed in criminal cases, and that
a new trial must be granted unless this presumption is re-
butted affirmatively by showing that there was, in fact, no
prejudice. Other cases hold that prejudice shall not be
presumed,—at least unless a probability of prejudice ap-
pears,—and that a new trial will not be granted unless the
accused affirmatively shows that he has been prejudiced.
(12 Cyc. 717, 718, and cases there cited; 12 Ency. of Pl.
& Pr. 602, 603, and cited cases; see, also, 20 R. C. L.
249-251, incl.)

This court has had occasion to pass on questions simi-
lar to those here involved in a number of cases. Counsel
for plaintiff in error rely strongly upon the reasoning of this
court in *McKinney* v. *People,* 2 Gilm. 540, where the court
says (p. 553): "The law in capital cases undoubtedly is
that, from the commencement of the trial until the rendi-
tion of the verdict, the jury, during all adjournments of
the court, should be placed in charge of an officer, unless
it is otherwise ordered by the court, by the consent of the
accused and the attorney for the people. * * * In this
case, if the jury did separate without the consent of the
prisoner it was an irregularity, and the court below would,
upon the fact being established, have been bound to set aside
the verdict and grant a new trial, unless such separation
was the result of misapprehension, accident or mistake on
the part of the jury and under circumstances to show that
such separation could by no possibility have resulted to the
prejudice of the prisoner." And they also rely particularly

upon the reasoning of this court in *Jumpertz* v. *People,* 21 Ill. 375, in which opinion the court said (p. 411) : "If ever the time shall come when juries are not kept entirely separated from and in utter ignorance of the prejudices and cries of the public which may call for the blood of a victim, then no man will be safe. The innocent as well as the guilty is in danger of being tried by a public mob and condemned in a frenzy of excitement, where suspicion may be aroused without cause and culminate into condemnation without reason or reflection. Human passions and prejudices, like fire, increase, rage and intensify by their likes which surround them and with which they commingle. It is in such times as these that the least contact of the jury with this outside pressure endangers the innocent as well as the guilty. The poison distilled by public prejudice may by little more than a moment's exposure be diffused through the jury room, intimidating the weak and exciting the impulsive." Both of these authorities on these points were cited with approval by this court in *Russell* v. *People,* 44 Ill. 508.

In *Reins* v. *People,* 30 Ill. 256, where the accused was on trial for manslaughter, it was stated by the court (p. 273) : "In capital cases even, where life is at stake, the separation of a jury without consent is not of itself error and ground for a new trial. Something more must be shown. It must be shown that the accused might have been prejudiced by it; that the jurors, or some one of them, might have been tampered with or improperly influenced or some means exerted over them in consequence of their separating, so as to influence their verdict. [Citing authorities.] These were all capital cases."

In *Miller* v. *People,* 39 Ill. 457, the court said (p. 467) : "As to the misconduct of the officers in suffering individual jurors to separate from the panel after the case was committed to them, in the absence of undue influences upon them while so separate, we would not for that reason set

aside a verdict otherwise proper. The officer deserves the punishment of the court, but there is no proof the prisoners have been prejudiced by his misconduct,"—citing in support of this statement, among other cases, *Reins* v. *People, supra.*

In *Gott* v. *People,* 187 Ill. 249 the court had under consideration the separation of some of the jurors from the rest during the trial, and after stating the facts and reviewing most of the authorities in this State heretofore referred to, held that such separation was not ground for new trial, as it was not shown that the jurors were thus exposed to any outside influence which might have operated to the prejudice of the accused.

In *Marzen* v. *People; supra,* the court said (p. 88) : "In the absence of any showing or just inference of prejudice to the defendant, the mere fact the jurors were not at all times kept together and that other persons were allowed to speak to them is not sufficient, within itself, to set aside a verdict otherwise clearly right,"—citing authorities in support of this doctrine.

Again, in *Flanagan* v. *People,* 214 Ill. 170, the court considered a similar question and stated (p. 180) : "The record shows that the jury were permitted by the court to separate during the recess or adjournment of the court while the trial was going on. In cases of this kind the separation of a jury without consent is not of itself error and ground for a new trial. It must be shown that the accused was prejudiced by the separation and that the jury were subjected to some influence which might have operated to the prejudice of the case. [Citing authorities.] There is nothing in the present record to show that any of the jurors were, or might have been, tampered with or improperly influenced, or that the plaintiffs in error were in any way injured or prejudiced by the fact that the jury were permitted to separate during the adjournment." And the judgment of the trial court was affirmed.

It is apparent that most, if not all, of these decisions from this State were with reference to the separation of the jury, and counsel for the State argue that there was no separation, in a technical or real sense, in this trial. Of course, the mere separation of the jurors is not the real ground of complaint as to such action. The real reason for complaint is the opportunity it offers for improper influences to reach and affect the jurors thus separated from their fellows. But we agree with the argument of counsel for the plaintiff in error that communications with jurors when they are not separated may be just as prejudicial as communications made with the jurors when they are separated. This seems to be the reasoning in 2 Thompson on Trials, (2d ed.) sec. 2553.

In one of the leading authorities cited by counsel for both sides, *Douglas* v. *State,* 137 Am. St. Rep. 930, (58 Tex. Crim. 122,) the opinion states (p. 935) : "We have not infrequently held that matters of this sort are particularly cognizable by the trial court, and unless the conclusion reached by the court on the hearing of the same is clearly wrong and unsupported by the testimony we ought not to and cannot interfere,"—citing numerous authorities in support of this holding. This conclusion that such matters are largely in the discretion of the trial court, as it is in better position to hear and pass on them understandingly, seems to be supported by the weight of authority in all jurisdictions. (See 20 R. C. L. 252; *State* v. *Robidou,* Ann. Cas. 1912D (20 N. D. 518,) 1015, and authorities in note.) The trial judge in this case reviewed at length, in overruling the motion for new trial, all of these affidavits and many of the decisions here referred to, and stated among other things: "Now, in the cases before me of the Supreme Court I have not found any case where the breach of confidence was to the same extent that occurred, as shown by the record, in this case, but my idea is this: that I must be governed by the principle of law that is involved in a matter

of this kind, and that is, that mere misconduct, alone, will not invalidate a verdict unless there is such a showing of facts as will raise a reasonable fear in the mind of the court that prejudiced the rights of the defendant, and I think this record will be searched in vain for any showing of that kind other than the mere fact of the misconduct."

One of the decisions of this State not heretofore referred to, touching this question, is *Adams* v. *People,* 47 Ill. 376. In that case a somewhat similar question was raised as is raised here, and the court said (p. 381) : "It certainly was the duty of the officers to keep the jury, when at their meals or sleeping, entirely removed from the company of others. They should eat by themselves, and sleep with none present but the officers in charge. (*Jumpertz* v. *People,* 21 Ill. 406.) It was indiscreet to permit them, during a meal or when in their lodging room, to be in company with others, but unless it is clearly shown they were by such exposure operated on in some way to the prejudice of the prisoner, we do not think a verdict for that cause alone should be set aside. That, with other causes, would have weight, but of itself could not influence the judgment of the court to disturb a verdict, when from the whole record it appears justice has been done." This reasoning, and the rules of law laid down by the decisions in this State, we think are in harmony with the weight of authority in other jurisdictions. See *Hilton* v. *Southwick,* 35 Am. Dec. 253, (17 Maine, 303,) and numerous authorities cited in note.

We do not think this verdict should be set aside for any one of the many acts of misconduct charged in the affidavits filed on motion for new trial, but we are of the opinion, in view of these numerous acts, that they may have weight, in connection with other matters that took place on the trial, in deciding whether or not the verdict should be disturbed.

It is also argued by counsel for plaintiff in error that the court committed error in refusing to permit them to

290 — 19

introduce evidence and papers in connection with plaintiff in error's claim that he charged Mead with improper actions in connection with the business of the bank. They offered to show by the introduction of certain correspondence and other papers with reference to the Gamblin loan that plaintiff in error charged that Mead's actions in that regard were unbusinesslike and improper, and that this evidence should have been permitted to be introduced for the consideration of the jury to corroborate the testimony of plaintiff in error, and to show that what he testified he charged against Mead and talked to him about on the day of the homicide was sustained by these records. This evidence was objected to as not being competent, and the objection was sustained and the admission of the papers refused. Counsel for plaintiff in error also insist that the court erred in not permitting them to introduce certain papers with reference to the so-called gambling contract in United States steel stock by C. L. Short, the father-in-law of Mead, with Mead's sanction and approval; that these papers were offered for the purpose of showing that plaintiff in error's testimony as to the transaction was based on facts, and that therefore the court should have permitted this evidence. The objection to this evidence being admitted was, that the testimony of plaintiff in error and the evidence admitted with reference to these transactions showed clearly the whole history of these transactions and the reason why the plaintiff in error claimed they were improper, and would justify the argument of plaintiff in error that Mead should not hold his position longer as cashier of the bank and would justify his dismissal by the stockholders. There can be no question that evidence which tends in any way to show motive on the part of the accused or will fairly tend to explain his actions should be admitted. The test of the admissibility of evidence in connection with the crime charged is whether the offered testimony tends directly to show whether the accused is guilty of the crime charged. (*People* v. *Moel-*

*ler,* 260 Ill. 375; *People* v. *Jennings,* 252 id. 534.)    Any
circumstance may be put in evidence which may tend to
make the proposition at issue appear more or less probable.
(1 Wharton on Crim. Evidence,—3d ed.—sec. 21.)    We
hold that under the authorities this evidence, if admitted,
would tend to raise collateral issues, and thus confuse the
jury rather than assist them in reaching a proper conclu-
sion on the merits of the case.    We do not think the re-
fusal to admit this testimony was prejudicial to the inter-
ests of plaintiff in error.

Counsel for plaintiff in error also urge that the court
erred in giving and refusing certain instructions.    Among
others, they complain of the misleading character of instruc-
tions 4 and 6 given for the People, reading as follows:

4. "You are instructed that it is not necessary for the
People to prove every count in the indictment, but if they
have proved every material allegation in any one count be-
yond a reasonable doubt, that is sufficient to sustain a con-
viction under that count."

6. "The jury are instructed that the deliberate intention
called malice aforethought need be only such deliberation
and thought as enables a person to appreciate and under-
stand, at the time the act was committed, the nature of
his act and its probable result."

It is urged that instruction 4 ignores the defense of self-
defense; that under the reasoning of this court in *People*
v. *Penman,* 271 Ill. 82, and *People* v. *Casey,* 231 id. 261,
the giving of an instruction ignoring the theory of self-
defense is erroneous.    It is urged by counsel for the State
that the decisions just cited referred to the defense of insan-
ity and not to self-defense, and therefore are not control-
ling here.    They also urge that each count of the indictment
charged the felonious killing with malice aforethought, and
that therefore this instruction would require the killing with
malice aforethought, and that this court has held that malice
aforethought is incompatible with the taking of human life

in self-defense. (*Hammond* v. *People,* 199 Ill. 173.) · They also urge that other instructions given set forth clearly and emphatically that plaintiff in error was not guilty if he committed the act in self-defense. The objection of counsel for plaintiff in error to the giving of instruction 6 is that it practically advises the jury that deliberate intention is malice aforethought, and that from the wording of this instruction the jury were led to believe that the accused deliberately and intentionally shot the deceased and that this was a malicious killing with malice aforethought, and that one may deliberately and intentionally kill another in self-defense without the implication of malice. Whatever may have been thought of the testimony of the accused, it was erroneous to ignore the theory of his defense. (*Hammond* v. *People, supra.*) There can be no question that in passing on the correctness of an instruction it is not necessary that each instruction in the series should contain the whole law of the case or call the attention of the jury to all of the contentions of the respective parties; that it is sufficient if the series of instructions, considered as a whole, fully and fairly announce the rules of law applicable to·the theory of the prosecution and that of the defense. (*Lilly* v. *People,* 148 Ill. 467; *Waller* v. *People,* 209 id. 284.) While this is true, it has also been held that the giving of a correct instruction does not cure the error of an incorrect one, as it is impossible to tell which the jury followed. *People* v. *Lee,* 248 Ill. 64; *People* v. *Harvey,* 286 id. 593, and cases there cited.

Objection is also made to the giving of instruction 8 for the People. This instruction is, in substance, the same as instruction 61 considered by this court in *Morello* v. *People,* 226 Ill. 388. In the last mentioned case it was de- ·cided that the instruction was misleading and improperly worded, although the court refused to reverse in that case on the ground that, taking the entire record together, it did not consider the wording of this instruction reversible er-

ror. The same may be said here as to this instruction. We think the criticism of the instruction in *Morello* v. *People, supra,* applies here.

All of these instructions are subject to criticism in the particulars urged and they may have tended to mislead the jury on the issues involved herein. Considering all the instructions together, along with the record, we do not think the error in any one of them would be sufficient, in itself, to cause a reversal of this case, but the misleading character of all of them, taken together, might have seriously prejudiced plaintiff in error.

Other instructions are criticised, but we do not deem the criticism of any of them of sufficient importance to require a particular reference here.

We have already stated that the character of the evidence was such as to require accurate rulings on the part of the trial court. While we do not hold that the actions of the officers in charge of the jury were maliciously careless, we are disposed to think they failed to appreciate the importance of their duties and functions in caring for the jurors under their charge in this case. No more solemn duty is placed upon anyone than that of determining whether the acts and conduct of a fellow-man warrant the forfeiture of his liberty or life. In view of the character of the evidence in the case and the many improper actions that were allowed, whether knowingly or not, by the bailiffs in charge of the jury, and the errors in rulings as to instructions, we think our duty requires us to permit another jury to pass on the question of the guilt or innocence of the accused.

The judgment will therefore be reversed and the cause remanded.     *Reversed and remanded.*

Mr. JUSTICE STONE took no part in this decision.