## STATE OF CONNECTICUT *v.* SHAWN NEWSOME (14947)

Peters, C. J., and Callahan, Berdon, Norcott and Katz, Js.

Argued January 17—officially released August 6, 1996

*Timothy H. Everett,* with whom were *Patrick Bristol* and *Sandra Crowell,* legal interns, and, on the brief, *David Schneider,* legal intern, for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *John Blawie,* assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant, Shawn Newsome, was convicted after a jury trial of murder in violation of General Statutes § 53a-54a.[1] He was sentenced to forty-five years imprisonment. He appeals from the trial court's judgment of conviction directly to this court pursuant to General Statutes § 51-199 (b) (3).[2] We affirm the trial court's judgment.

The jury reasonably could have found the following facts. At approximately 10:30 p.m. on March 4, 1992, Bridgeport police officer David Daniels heard two gunshots fired in the area of 455 Trumbull Avenue in Bridgeport. When Daniels responded to the location where he believed the shots had been fired, he saw a car leave the area and discovered the victim, Lance Surrency, lying in the grass in front of 385 Trumbull Avenue. The victim had been shot in the face and was unresponsive. He died shortly thereafter.

---

[1] General Statutes § 53a-54a provides: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

[2] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

The following day, the police questioned Rodney Womble about the shooting. In a signed, sworn statement, Womble identified the defendant as the person who had shot the victim. Womble told the police that on the previous evening he had observed a fight between the victim and several other men, including the defendant, while they were standing near a "food bus" in a parking lot of the Trumbull Gardens Housing Complex. Womble stated that the defendant had poured beer on the victim to provoke him to fight and had then taken out a gun and shot the victim. He further stated that immediately after the shooting, the defendant had entered a car parked nearby and had driven away.

The defendant was subsequently arrested and charged with the victim's murder. At both the probable cause hearing and at trial, Womble testified that although he had witnessed the shooting, he had not been able to identify the person who had shot the victim. Womble admitted that he had told the police that the defendant was the shooter, but claimed that he had only heard rumors that the defendant had shot the victim and had given the defendant's name to the police in order to leave the police station as quickly as possible. At the probable cause hearing, the state introduced the portion of Womble's prior statement to the police in which he described the shooting. The segment of the statement was offered for substantive purposes pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The trial court found probable cause to believe that the defendant had murdered the victim. At trial, the state introduced Womble's entire statement, with some redactions, for substantive purposes pursuant to *Whelan*. Womble's statement provided the only identification evidence against the defendant. The jury found the defendant guilty of murder.

Subsequently, the defendant moved for a new trial, claiming that he had been deprived of a fair trial by certain juror misconduct, namely: one juror's alleged visit to the scene of the crime; certain comments alleged to have been made by jurors regarding the dress and demeanor of certain witnesses and the credibility of Womble; and contact between one juror and a member of the defendant's family. After an evidentiary hearing, the trial court denied the defendant's motion, concluding that the challenged conduct had not affected the jury deliberations or prejudiced the defendant so as to require a new trial. Other facts will be discussed as they become relevant to the disposition of this appeal.

On appeal, the defendant claims that: (1) the trial court lacked jurisdiction to hear his case because the finding of probable cause was invalid; (2) the evidence admitted at trial was insufficient to sustain his conviction; (3) the trial court improperly admitted Womble's extrajudicial statement into evidence at trial; and (4) the trial court improperly denied his motion for a new trial based on juror misconduct. We affirm the judgment of conviction.

I

The defendant's first three claims relate to the *Whelan* rule, which permits "the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." *State* v. *Whelan*, supra, 200 Conn. 753. Specifically, the defendant first claims that the trial court's finding of probable cause was invalid because it improperly admitted, for substantive purposes, the portion of Womble's extrajudicial statement at the probable cause hearing. He argues that the statement failed to evince a basis of personal knowledge on the part of the declarant and that it was inherently unreliable and hence

inadmissible under *Whelan*. Alternatively, he claims that there was insufficient evidence to support a finding of probable cause.

The defendant next claims that there was insufficient evidence to support his conviction at trial. In this regard, he urges us to hold that a witness' prior statement identifying the accused, which is not confirmed at trial, is insufficient evidence as a matter of law to support a criminal conviction in the absence of additional corroborative evidence of identification. The defendant also appears to claim that, even in the absence of such a rule, the evidence adduced at trial was insufficient to support his conviction. Alternatively, the defendant claims that Womble's statement was improperly admitted at trial under *Whelan* for the same reasons he claims that it was improperly admitted at the probable cause hearing.

Finally, the defendant also urges us to adopt additional criteria, including a requirement of corroboration, for the admissibility of prior inconsistent statements as substantive evidence of identification and to require and institute special jury instructions to be given when a witness' prior inconsistent statement provides the only evidence of identification at trial. We address and reject each of these claims seriatim.

A

We turn first to the defendant's claim that the trial court's finding of probable cause "was not warranted by law" because the trial court improperly admitted a portion of Womble's prior inconsistent statement to the police for substantive purposes and because, even if the statement had been properly admitted, there was not sufficient evidence adduced at the hearing to support a finding of probable cause. We disagree.

The following additional facts are relevant to the resolution of these claims. Womble testified at the hear-

ing on probable cause that on the evening of March 4, 1992, he was standing in a parking lot on Trumbull Avenue at the Trumbull Gardens Housing Complex in Bridgeport when he saw several young men attack the victim, who was standing approximately one bus length away. At that time, Womble had known the victim for a few years. He also had known the defendant for a few years and had no difficulty recognizing him. Womble testified that he had seen the young men hit the victim, who had fought back but also had tried to get away. He then saw one of the men take a gun from his hooded sweatshirt and shoot the victim, who fell to the ground. Womble testified that he was unable to identify the person who had shot the victim because the shooter's face was obscured by the hood.

On cross-examination, Womble indicated that it had been dark when the shooting occurred, that it had been difficult to see who was fighting with the victim and that, although he knew who had been there, he had not "specifically" seen the defendant. When asked whether he had seen the defendant pour beer on the victim, Womble stated that he was "not quite sure" and that he "just [did not] remember." He stated that he had not been able to identify the person who had shot the victim, but that he had told the police that it was the defendant because that is what he had heard. Womble conceded that some of the information he had given in his statement to the police was not true, and that he had not at any point while giving the statement told the police that he had not actually seen the defendant shoot the victim, but that he had only heard that on the street. Further, he stated that he had not told the police that he had only heard that the defendant had shot the victim because he had wanted to leave the police station as quickly as possible.

Detective Lynn DeSarli, who had investigated the victim's death and who had interviewed Womble and had

taken his statement on March 5, 1992, also testified at the hearing in probable cause. She stated that Womble had told her that he had seen the defendant shoot the victim. The court found probable cause to believe that the defendant had murdered the victim.

"Article first, § 8, of the Connecticut constitution, as amended, provides in part that [n]o person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law." (Internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992). "[A]n invalid finding of probable cause at such a hearing undermines the court's power to hear the case at trial." *State* v. *Mitchell*, 200 Conn. 323, 332, 512 A.2d 140 (1986).

We turn first to the defendant's claim that the trial court improperly admitted a portion of Womble's statement to DeSarli at the probable cause hearing for substantive purposes pursuant to *State* v. *Whelan*, supra, 200 Conn. 743. The defendant argues that admission of the portion of the statement was improper because it failed to evince a basis for Womble's personal knowledge of the factual allegations it contained, since the statement "failed to state in so many words that the declarant actually *saw* the defendant shoot [the victim]," and, therefore, it "left ambiguous whether the declarant had the 'personal knowledge' prerequisite to admitting" the statement into evidence under *Whelan*. Moreover, the defendant claims that the statement failed to provide sufficient detail regarding the incident and that the statement was otherwise too unreliable to be admitted.

"General Statutes § 54-46a (b), the implementing legislation for article first, § 8, states that at a probable cause hearing '[t]he court shall be confined to the rules of evidence.' " *State* v. *Boyd*, 214 Conn. 132, 136–37,

570 A.2d 1125 (1990), on appeal after remand, 221 Conn. 685, 607 A.2d 376, cert. denied, 506 U.S. 923, 113 S. Ct. 349, 121 L. Ed. 2d 259 (1992). The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the wide discretion of the trial court. See *State* v. *Alvarez*, 216 Conn. 301, 314, 579 A.2d 515 (1990) (trial court did not abuse discretion in admitting witness' prior statement to police for substantive purposes). On appeal, the exercise of that discretion will not be disturbed except on a showing that it has been abused. Id.

Furthermore, "[o]ur review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection. . . . This court reviews rulings solely on the ground on which the party's objection is based. . . . [A]rticulating the basis of the objection alert[s] the court to any claims of error while there is still an opportunity for correction. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 310, 664 A.2d 743 (1995).

At the probable cause hearing, the defendant objected to the admission of Womble's extrajudicial statement on the ground that Womble's statement was not inconsistent with his testimony and, therefore, was not admissible under *Whelan*.[3] The trial court overruled

---

[3] At the probable cause hearing, defense counsel objected to the admission of the relevant portion of Womble's statement to DeSarli under *Whelan*, arguing: "In response to the State's question is that answer correct the answer was yeah, and [as] a result, Your Honor, there doesn't seem to be any reason to offer a statement. It's certainly not inconsistent. . . . There is no reason to put his statement into evidence through him to show that he said something other than what he's just testified to, because he's just admitted that what he said was correct . . . .

"I submit to the court Your Honor, that through the evidence presented from this witness, his statement cannot be entered through this witness. . . . the State specifically said to this gentleman, do you remember being asked a particular question, he said yes. The State specifically said is what you said in that question accurate, and he said yeah, therefore we have not heard that there was anything different in a written statement other than what he said here . . . ."

this objection, noting that although Womble had admitted making the statement to DeSarli, the portion of the statement sought to be admitted contained factual allegations inconsistent with his testimony and was, therefore, a prior inconsistent statement properly admitted pursuant to *Whelan*. The defendant does not challenge the trial court's ruling on this basis.

The claims raised on appeal by the defendant rather, challenge for the first time whether the *Whelan* statement satisfied the requirements of personal knowledge and reliability. However, "neither the trial court nor the prosecution was alerted to the possibility that the defendant's objection was grounded on anything other than [the fact that Womble had confirmed that he had made the statement sought to be admitted]. The state, therefore, did not have the opportunity to address or the court the occasion to rule on other grounds. Thus, to review the defendant's claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *State v. Prioleau*, supra, 235 Conn. 311. We, therefore, decline to review the trial court's ruling admitting the portion of Womble's statement on these grounds.

We turn next to the defendant's claim that, even if the portion of Womble's statement had been properly admitted, there was insufficient evidence to support the trial court's finding that the state had established probable cause to believe that the defendant had murdered the victim. We disagree.

It is well established that, "[a]lthough it must transcend mere speculation, the evidentiary standard for probable cause is, of course, less demanding than that which is required to sustain a conviction at trial. *State v. Patterson*, 213 Conn. 708, 720, 570 A.2d 174 (1990); *State v. Mitchell*, [supra, 200 Conn. 336]; see also *Bri-*

*negar* v. *United States*, 338 U.S. 160, 176, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949); *State* v. *Dennis*, 189 Conn. 429, 431–32, 456 A.2d 333 (1983). Viewing the proffered proof most favorably to the state, the court must decide whether the state's evidence would warrant a person of reasonable caution to believe that the respondent had committed the crime with which he was charged." *State* v. *Edwin*, 215 Conn. 277, 283–84, 575 A.2d 1016 (1990); see also *State* v. *Marra*, supra, 222 Conn. 513. In this case, the state was required to establish probable cause to believe that the defendant was guilty of intentional murder in violation of § 53a-54a, the elements of which are intent and causation. *State* v. *Rasmussen*, 225 Conn. 55, 74, 621 A.2d 728 (1993).

"On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. See Practice Book [§ 4060]. This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the [court's] decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Citation omitted; internal quotation marks omitted.) *In re Ralph M.*, 211 Conn. 289, 316, 559 A.2d 179 (1989).

The defendant does not contest the sufficiency of the evidence to establish that there was probable cause to believe that the person that shot the victim intentionally

caused his death. He focuses, rather, on the identity of the shooter. He argues that the portion of Womble's statement identifying him as the shooter was too unreliable to support the trial court's conclusion that there was probable cause to believe he had shot the victim because that portion failed to state specifically that Womble saw the defendant shoot the victim, it lacked a detailed account of the facts and circumstances of the shooting, and it was uncorroborated by other evidence tending to identify the defendant as the shooter. We disagree.

The trial court had before it Womble's testimony to the effect that, although he witnessed the victim's shooting, he had not been able to identify the person who shot the victim; the portion of his statement to police in which he described the shooting and identified the defendant as the shooter; his explanation of that statement; and DeSarli's testimony that Womble had told her that he had seen the defendant shoot the victim.[4] Womble's extrajudicial statement possessed ample indicia of reliability. The statement is in writing and signed. Womble admitted that it accurately represented the questions he was asked and the answers he had given and that he had signed it and had sworn to its truth when he had given it. We have noted that "[w]hile it is not necessary for a written, signed statement to be sworn in order for it to be admitted under the *Whelan* doctrine; *State* v. *Almeda*, 211 Conn. 441, 452, 560 A.2d 389 (1989); it certainly is a circumstance that adds to the reliability of the statement." *State* v. *Borrelli*, 227 Conn. 153, 160 n.6, 629 A.2d 1105 (1993).

Further, it is undisputed that Womble witnessed the shooting from a short distance away, that he was famil-

---

[4] An autopsy report identifying the cause of death as a gunshot wound to the victim's face and neck was also introduced into evidence at the probable cause hearing.

iar with both the defendant and the victim, and that he was able to identify the victim. His statement to DeSarli, made less than one day after the incident, described in detail, and in his own narrative, the course of the fight, the identity of the participants, the manner in which the defendant shot the victim, and the defendant's leaving the scene in a particular vehicle after the shooting. It is well established that "prior statements are, necessarily, made closer to the event in question, when memories are fresher and when there is less likelihood that the statement is the product of corruption, false suggestion, intimidation or appeals to sympathy." *State* v. *Whelan*, supra, 200 Conn. 750. Furthermore, Womble's out-of-court statement to DeSarli had, as noted in *Whelan*, the "added assurance of reliability that, if untrue, [Womble] faced prosecution for falsely reporting an incident to the police; General Statutes § 53a-180; *State* v. *Altrui*, 188 Conn. 161, 175, 448 A.2d 837 (1982); and because the statement was also sworn, for giving a false statement to the police. General Statutes § 53a-157." *State* v. *Whelan*, supra, 200 Conn. 754–55.

Although Womble testified at the probable cause hearing that he had not been able to identify the man whom he had seen shoot the victim, a reasonably cautious person could have disbelieved Womble's testimony and his explanation for his statement to DeSarli, and could have credited the eyewitness identification of the defendant that he made in his statement. In light of the statement's strong indicia of reliability, we conclude there was substantial evidence to support the trial court's finding of probable cause.

## B

The defendant next claims that there was insufficient evidence to support his conviction at trial. In this regard he urges us to adopt a per se rule that a prior extrajudi-

cial statement identifying the accused that is not confirmed at trial is insufficient to support a conviction in the absence of additional, corroborative evidence tending to link the accused to the crime charged. Alternatively, he appears also to argue that there was insufficient evidence in the circumstances of this case to support his conviction. We decline to adopt the per se rule advanced by the defendant and reject his claim that there was not sufficient evidence to support his conviction.

1

"In *State* v. *Whelan*, [supra, 200 Conn. 748–49] we abandoned the traditional view 'that a prior inconsistent statement of a nonparty witness is inadmissible hearsay if offered to prove the truth of the matters asserted therein and, therefore, is admissible only for impeachment purposes.' " *State* v. *Hopkins*, 222 Conn. 117, 122–23, 609 A.2d 236 (1992). In *Whelan*, we carefully considered the rationale for the common law prohibition on the substantive use of prior inconsistent statements and the criticisms of that rule. We noted that "[t]he logic of [the] orthodox rule is that the prior inconsistent statement of a witness is too unreliable to be admitted as substantive evidence because the declarant was not (1) under oath and subject to punishment for perjury, (2) in the presence of the trier of fact, or (3) subject to cross-examination." *State* v. *Whelan*, supra, 749. We acknowledged, however, the view of many scholars and commentators that "the oath is not as strong a guaranty of trustworthiness as it once may have been, and that the requirements that the jury observe the declarant and that the defendant have the opportunity to cross-examine are met when the declarant takes the stand and is subject to cross-examination. See e.g., McCormick, Evidence (3d Ed. 1984) § 251; 3A Wigmore, Evidence (Chadbourn Rev. 1970) § 1018; Graham, 'Employing Inconsistent Statements for

Impeachment and as Substantive Evidence,' 75 Mich. L. Rev. 1565 (1977)." *State* v. *Whelan,* supra, 749–50.

Further, we agreed with several commentators that "when the declarant is available for cross-examination the jury has the opportunity to observe him as he repudiates or varies his former statement. The cross-examination to which a recanting witness will be subjected is likely to be meaningful because the witness will be forced either to explain the discrepancies between the earlier statements and his present testimony, or to deny that the earlier statement was made at all. If, from all that the jury sees of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. . . . The jury can, therefore, determine whether to believe the present testimony, the prior statement, or neither." (Citations omitted; internal quotation marks omitted.) Id., 750.

We concluded that "the prevailing reasons for refusing to allow any prior inconsistent statement to be used as substantive evidence are no longer valid"; id., 752; and that an exception to the hearsay rule was appropriate "where the statements are made under conditions deemed to render them equal in reliability and trustworthiness to those made under the sanction of an oath and the test of cross-examination." (Internal quotation marks omitted.) Id. In this regard, however, we declined to follow "the modern view favoring substantive admissibility for all prior inconsistent statements where the [declarant] is in court and subject to cross-examination," concluding that certain additional criteria of admissibility were appropriate to ensure the reliability of such statements for substantive use. Id. Noting the many hazards associated with the reporting and use of prior oral statements; see id., 753–54; we adopted "a rule allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has

personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." Id., 753.

We have not yet addressed the precise question raised by the defendant, namely whether a prior inconsistent statement admitted for its substantive value pursuant to *Whelan* that constitutes the sole evidence identifying the accused is sufficient to support a conviction. Cf. *State* v. *Borelli*, supra, 227 Conn. 161 (observations by police officer of marks on victim's body that confirmed victim's statement to police enhanced reliability of victim's prior statement that was inconsistent with her trial testimony and "prevent[ed] the specter of a prosecution based solely on an out-of-court inconsistent statement"); *State* v. *Hopkins*, supra, 222 Conn. 124 (victim's prior inconsistent statement to police corroborated by her prior sworn testimony from probable cause hearing); but see *State* v. *Jones*, 234 Conn. 324, 332–33, 662 A.2d 1199 (1995) (noting that "fact that certain testimony is uncorroborated, or even contradicted, does not make it insufficient to support a verdict if the testimony is believed by the trier," and fact that witness has recanted prior identification of defendant that was given to police shortly after incident does not warrant conclusion that no rational juror could have credited witness' positive identification of defendant). The defendant urges us to conclude that a prior inconsistent statement that provides the sole evidence of identification is never sufficient to support a conviction, arguing that when such a situation arises, "the jury's finding of guilt necessarily rests on speculation and conjecture." In this regard, the defendant argues that, although a prior inconsistent statement properly serves to impeach a witness' in-court testimony, the jury's rejection of the witness' testimony does not permit it to believe that the opposite of that testimony is true, and a prior inconsistent statement is not sufficiently reliable, regardless

of the circumstances surrounding its making and the witness' recanting of it, to prove the defendant's identity as the perpetrator beyond a reasonable doubt.

In support of his claim, the defendant relies principally on three cases: *United States* v. *Orrico*, 599 F.2d 113 (6th Cir. 1979), *Commonwealth* v. *Daye*, 393 Mass. 55, 469 N.E.2d 483 (1984), and *People* v. *Gould*, 54 Cal. 2d 621, 354 P.2d 865, 7 Cal. Rptr. 273 (1960), which was recently overruled in this respect by *People* v. *Cuevas*, 12 Cal. 4th 252, 906 P.2d 1290, 48 Cal. Rptr. 2d 135 (1995). In *United States* v. *Orrico*, supra, 599 F.2d 113, the United States District Court had held that if a prior inconsistent statement was the only source of support for the central allegations of a charge involving the fraudulent conversion and interstate transport of certain checks, the statement was insufficient to support a finding of guilt beyond a reasonable doubt for every element of the crime charged. After discussing the federal law regarding the admission of prior inconsistent statements for substantive purposes; see Federal Rule of Evidence 801 (d) (1) (A); the United States Court of Appeals, focusing on the fact that the statement in that case barely satisfied the prerequisites to admissibility, rejected the use of the statement alone as sufficient to support the defendant's conviction. *United States* v. *Orrico*, supra, 119. In so doing, the Court of Appeals did not set forth a bright line corroboration rule, but rather noted that "[i]t is doubtful . . . that in any but the most unusual case, a prior inconsistent statement alone will suffice to support a conviction since it is unlikely that a reasonable juror could be convinced beyond a reasonable doubt by such evidence alone." Id., 118; see 4 J. Weinstein, Evidence (1996) p. 801-142.

In *Daye*, the Supreme Judicial Court of Massachusetts held, prospectively, that "inconsistent grand jury testimony may be admitted in limited circumstances for its probative worth . . . ." *Commonwealth* v. *Daye*,

supra, 393 Mass. 74. In order for such testimony[5] to be admissible, the court required that the declarant be available for cross-examination at trial, which requirement is not met if the witness "has no recollection of the events to which the statement relates"; id., 73; and that it be "clear that the statement was that of the witness, rather than the interrogator." Id., 74. The court also stated that it "[would] not permit convictions based exclusively on inconsistent extrajudicial testimony to stand." Id. In this regard, the court required "the Commonwealth [to] produce identification evidence in addition to a prior inconsistent statement in order to meet its burden of proof"; id.; leaving open "what other evidence would be required where the issue to which the prior inconsistent statement relates is not identification." Id., 75.

Finally, in *People* v. *Gould*, supra, 54 Cal. 2d 631, the California Supreme Court held that a testifying witness' out-of-court identification "that cannot be confirmed by an identification [of the defendant] at the trial is insufficient to sustain a conviction in the absence of other evidence tending to connect the defendant with the crime."

In *People* v. *Cuevas*, supra, 12 Cal. 4th 252, the California Supreme Court thoroughly analyzed the rationale and value of the *Gould* corroboration requirement and ultimately rejected it. The court in *Cuevas* reasoned that the corroboration requirement it had established in *Gould* was overbroad and had not proved necessary to combat any perceived abuse of the use of out-of-court identifications. It concluded that the underlying concerns regarding the substantive use of this type of evidence were adequately addressed by requiring such

---

[5] It appears that, in Massachusetts, a prior inconsistent statement that was not made under oath is admissible for substantive use only if it is "uncontroverted that the identification or statement was made." *Commonwealth* v. *Daye*, supra, 393 Mass. 61 n.9.

identifications to be reliable in order to be admitted and by reviewing the sufficiency of this type of evidence on a case-by-case basis under the generally applicable standard. Id., 269. We agree.

The court in *Cuevas* recognized initially that "the *Gould* corroboration requirement [cannot] be justified on the ground that out-of-court identifications are inherently reliable"; id., 265; noting that the court in *Gould* "itself recognized that an out-of-court identification generally has *greater* probative value than an in-court identification, even when the identifying witness does not confirm the out-of-court identification." (Emphasis in original.) Id. We, too, have recognized that "prior statements are, necessarily, made closer to the event in question, when memories are fresher and when there is less likelihood that the statement is the product of corruption, false suggestion, intimidation or appeals to sympathy." *State* v. *Whelan*, supra, 200 Conn. 750. In light of this acknowledgment, "[i]t is paradoxical, as other courts have recognized, to acknowledge [this] . . . and yet hold that an in-court identification is sufficient evidence on which to base a conviction but an out-of-court identification is not." *People* v. *Cuevas*, supra, 12 Cal. 4th 265. Likewise, it is inconsistent to require corroboration only of out-of-court identifications, "but not of other types of hearsay that might be offered as evidence of guilt." Id.

Furthermore, as the court in *Cuevas* noted, "[t]he *Gould* corroboration requirement also finds no support in the law of other jurisdictions, federal or state, that admit out-of-court statements of identification. Like *Gould*, the federal courts and the great majority of state courts admit out-of-court identification when the identifying witness testifies and is subject to cross-examination. But no jurisdiction that admits out-of-court identifications has adopted the broad holding in *Gould* . . . that an out-of-court identification can *never* by

itself be sufficient to support a conviction. To the contrary, numerous courts have held that an out-of-court identification can be sufficient by itself to support a conviction even in the absence of other evidence connecting the defendant to the crime. [*Acosta* v. *State*, 417 A.2d 373 (Del. 1980); *Watkins* v. *State*, 446 N.E.2d 949, 957 (Ind. 1983); *Bedford* v. *State*, 293 Md. 172, 443 A.2d 84 (1982); *Nance* v. *State*, 331 Md. 549, 629 A.2d 633 (1993); *State* v. *Mancine*, 124 N.J. 232, 256, 590 A.2d 1107 (1991); *State* v. *Robar*, 157 Vt. 387, 395, 601 A.2d 1376 (1991); *State* v. *Hendrix*, 50 Wis. App. 510, 514–16, 749 P.2d 210 (1988)]." (Emphasis in original.) *People* v. *Cuevas*, supra, 12 Cal. 4th 266–67.

We also agree with the court in *Cuevas* that a per se rule requiring corroboration of a prior inconsistent statement identifying the accused is overbroad. "The *Gould* corroboration requirement, by inflexibly requiring corroboration of all unconfirmed out-of-court identifications regardless of their probative value, does not take into account the many varied circumstances that may attend an out-of-court identification and affect its probative value. These circumstances include, for example: (1) the identifying witness's prior familiarity with the defendant; (2) the witness's opportunity to observe the perpetrator during the commission of the crime; (3) whether the witness has a motive to falsely implicate the defendant; and (4) the level of detail given by the witness in the out-of-court identification and any accompanying description of the crime. . . . Evidence of these circumstances can bolster the probative value of the out-of-court identification by corroborating both that the witness actually made the out-of-court identification (e.g., testimony by the police officer or other person to whom the statement was made) and that the identification was reliable (e.g., evidence that the witness was present at the scene of the crime and in a position to observe the perpetrator, evidence that the

witness had a prior familiarity with the defendant, or evidence that the witness had no self-serving motive to implicate the defendant). Such evidence can show the accuracy and reliability of the out-of-court identification, even though none of it is independent evidence connecting the defendant to the crime, the corroboration required by *Gould*.

"Nor does the *Gould* corroboration requirement take account of the many varied circumstances relating to the witness's failure to identify the defendant at trial. Among these circumstances are: (1) whether the identifying witness admits, denies, or fails to remember making the out-of-court identification; (2) whether the witness remembers the underlying events of the crime but no longer believes in the accuracy of the out-of-court identification; (3) whether, if the witness claims the identification was false or erroneous, the witness offers an explanation for making a false or erroneous identification; (4) whether, if the witness claims a failure of recollection, there are reasons supporting the loss of memory; (5) whether there is evidence that the witness's failure to confirm the identification in court resulted from the witness's appreciation that doing so would result in the defendant's conviction; or (6) whether there is evidence that . . . the witness's failure to confirm the identification arises from fear or intimidation.

"As *Gould* itself recognized, the probative value of a witness's out-of-court identification can vary tremendously depending on these surrounding circumstances." (Citation omitted.) Id., 267–68. The variation in the probative value of this type of evidence was illustrated by two examples. "In the first example, an identifying witness who is incarcerated allegedly tells his cellmate that he saw the defendant commit the crime. The alleged statement of identification to the cellmate contains no assertion of a prior acquaintance

between the witness and the defendant, and does not describe the circumstances surrounding the crime or any other details subject to corroboration. When the witness is called to testify at trial, the witness denies making the identification to his cellmate, denies the truth of the identification, denies knowing anything about the defendant's crime, and denies ever having known or seen the defendant. The cellmate testifies to the witness's out-of-court identification as a prior inconsistent statement. . . . The defense then presents unrebutted evidence showing that the witness was in another state at the time of the crime and the cellmate has been promised a reduced sentence in exchange for his testimony. Under these circumstances, the probative value of the out-of-court identification would be very low.

"By contrast, consider a witness who gives a videotaped statement to the police immediately after observing the commission of the crime. The witness has known the defendant for many years, identifies the defendant as the perpetrator, and gives many details of the crime that only someone who observed the crime would likely know. Before trial, the witness is in an automobile accident and loses all memory of the crime. The prosecution introduces the videotaped statement as the witness's past recollection recorded . . . and offers other evidence showing that the witness was present at the scene of the crime. The defense presents no evidence to impeach the witness's identification. Under these circumstances, the probative value of this out-of-court identification would be high." (Citations omitted.) Id., 268–69. However, "[n]otwithstanding the disparity in probative value between the out-of-court identifications in these two examples, under the *Gould* corroboration requirement both are equally insufficient to support a conviction." Id., 269.

Also relevant to our evaluation of the necessity of a corroboration requirement are the criteria for admissibility that we have already established. In *Whelan,* we deliberately adopted a cautious approach to the substantive use of prior inconsistent statements, not limited to those providing identification, by requiring, in order for such a statement to be admissible, that it be in writing and be signed, that the declarant have a basis of personal knowledge for the information provided and that the declarant be available for cross-examination. *State* v. *Whelan,* supra, 200 Conn. 753. These criteria, particularly cross-examination, provide substantial assurance of reliability. "The witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore. The reasons for the change of face, whether forgetfulness, carelessness, pity, terror, or greed, may be explored by the two questioners in the presence of the trier of fact, under oath, casting light on which is the true story and which the false. It is hard to escape the view that evidence of a prior inconsistent statement when the declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony." 2 C. McCormick, Evidence (4th Ed. Strong 1992) § 251, p. 120. As was noted by Judge Learned Hand, in observing that juries are fully capable of determining the credibility of a witness' out-of-court statements that are inconsistent with his trial testimony, "[t]here is no mythical necessity that the case must be decided only in accordance with the truth of the words uttered under oath in court." *Di Carlo* v. *United States,* 6 F.2d 364, 368 (2d Cir. 1925). "If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person in court." Id.

"Corroboration requirements are the exception, not the rule." *People* v. *Cuevas*, supra, 12 Cal. 4th 264. In light of the anomalous results such a requirement would produce, the safeguards we have imposed to ensure, generally, the reliability of a prior inconsistent statement admitted for its substantive value and the confidence we have expressed in juries to evaluate conflicting evidence critically, we agree with the court in *Cuevas* that "it is unwise to attempt to subsume the whole spectrum of out-of-court identifications under a rule that deems insufficient *as a matter of law* any out-of-court identification uncorroborated by other evidence connecting the defendant to the crime. Instead, the case-by-case analysis that we apply in reviewing the sufficiency . . . of evidence . . . is preferable because it permits an individualized assessment of the probative value of the particular out-of-court identification at issue." (Emphasis in original.) Id., 269. Under California law, in reviewing the sufficiency of the evidence to support a conviction, the court applies the "substantial evidence test." Id. "Under this standard, the probative value of the identification and whatever other evidence there is in the record are considered together to determine whether a reasonable trier of fact could find the elements of the crime proven beyond a reasonable doubt." Id., 274. This is akin to our own standard for evaluating the sufficiency of the evidence to support a conviction, pursuant to which we determine, construing the evidence in the light most favorable to sustaining the verdict, "whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Mejia*, 233 Conn. 215, 223, 658 A.2d 571 (1995). We therefore reject the defendant's request that we conclude that a prior incon-

sistent statement that provides the sole evidence of identification is, as a matter of law, insufficient to sustain a conviction.

### 2

We turn next to the defendant's claim that the totality of the evidence in this case was insufficient to support his conviction. In this regard, he argues that Womble's statement was the sole evidence linking him to the shooting and, because Womble did not confirm the identification of the defendant as the shooter and there was no other evidence corroborating his recanted out-of-court identification of the defendant as the shooter, there was not adequate evidence for the jury to have found him guilty beyond a reasonable doubt. We disagree.

The following additional facts are relevant to this claim. At trial, Womble testified that at approximately 10:30 p.m. on March 4, 1992, he was standing in a parking lot of the Trumbull Gardens Housing Complex when he saw several young men, including "Jerry [Fleming] and Fats," "jump on" the victim. He stated that he did not think that the defendant had been present when the young men were fighting with the victim, and that he had not seen the defendant fighting with the victim. Womble had known the victim for several years and had been talking to him a few minutes before he was shot. According to Womble, the victim's brother was present when the fight began, but he ran off. Womble testified that he was about one bus length away from the victim when the victim was shot by one of the men fighting with him. Womble claimed that he had heard two gunshots that sounded to him like they were fired from a .38 caliber gun, but that he had not been able to identify the man who had shot the victim. He testified that Fleming had been outside when the victim was shot, but that Fleming had not shot the victim.

Womble admitted that when he had been interviewed the day following the shooting he had told the police that the defendant was one of the young men who had fought with the victim the night before, and that he had told the police that the defendant had pulled out a gun from his "hoody" pocket and shot the victim, after which the defendant immediately left the scene in a blue or black Regal. He stated that the defendant had returned to the scene sometime later, driving up and down Trumbull Avenue in a different car. He also admitted that he had identified the defendant as the shooter from a photographic array. Womble claimed that he had given the police the defendant's name in his statement about the incident the next day because he had heard that the defendant had shot the victim. He testified that he was not afraid of retaliation for the statement he had given to the police and that he did not recall telling Detective DeSarli that he feared retaliation. DeSarli testified that when she had interviewed Womble, he had indicated that he was afraid that someone might "get him" if he came forward with the information he had about the shooting.[6] Over the defendant's objection, Womble's statement to DeSarli, redacted in part, was read to the jury.[7]

[6] We note that, while the defendant vigorously but unsuccessfully challenged as hearsay DeSarli's testimony concerning Womble's fear of retaliation, which was admitted under the "state of mind" exception to explain subsequent conduct, he does not continue that challenge in this appeal.

[7] The statement read to the jury provides as follows: "City of Bridgeport, Department of Police. Statement. Date: March 5, 1992. Time started: 13:20. Statement taken by: Detective L. A. DeSarli. Location: Detective Bureau, 300 Congress Street. In the presence of: not applicable. The giving of a false statement and/or the tampering with or fabrication of physical evidence is in violation of the existing laws of the State of Connecticut and are punishable under Sections 53a-155 and 53a-157 of the Connecticut General Statutes.

"Q. What is you full name, address, date of birth, social security number and home telephone number?

"A. Rodney E. Womble, 555 Trumbull Avenue, Apartment 201, 5-3-67 . . . .

"Q. What is your current occupation and the name, address and telephone of your employer?

"A. Unemployed.

On cross-examination, Womble agreed that it was dark on the night of the shooting, that several of the men fighting with the victim had been wearing hoods

"Q. Ask, if applicable, have you been advised of your Constitutional safeguards, rights, prior to giving the statement and do you understand these rights?

"A. Not applicable.

"Q. Have any promises or rewards been offered to you or have you been threatened in any way into making this statement?

"A. No.

"Q. How much education have you had and can you read and write English?

"A. Eleventh grade. I can read and write English.

"Q. Why are you giving this statement at this time and what is it in reference to?

"A. About the shooting last night.

"Q. Please tell me in your own words what occurred last night?

"A. All the young boys were out there behind the bus, the food bus, they were all scuffling against Lorenzo. Shawn Newsome, Jared Fleming, Fats, Major, they were all hitting on him for what reason I don't know. Shawn poured beer on him trying to entice him to fight. . . . Major tried to help him in the end . . . but Shawn pulled out the gun and shot Lorenzo. They were only three or four feet away. A blue Regal was parked right there and Shawn jumped in and drove away. He came back later in another car. The car he came back in was a dark blue maybe an older New Yorker, he kept, he just kept driving up and down the street drinking and smoking.

"Q. Where were you when the shooting occurred?

"A. I was in the walkway of the first parking lot right by the front of the food bus, I was about a bus length away from Lorenzo when he got shot.

"Q. Were you friends with Lorenzo?

"A. Yes. We were just talking before it happened about an hour before.

"Q. Describe Shawn to me?

"A. About my complexion, about five foot ten, medium husky build, clean face, I don't think he's more than twenty.

"Q. What was he wearing last night?

"A. I think a pair of jeans and a blue starter jacket.

"Q. What type of gun did he have?

"A. I really couldn't make out what kind it was but it sounded like a .38.

"Q. How many shots were fired?

"A. Two, one after the other.

"Q. Approximately what time was it when the shooting occurred?

"A. I think about ten thirty, quarter to eleven p.m.

"Q. Did Shawn have the gun out the entire time while they were arguing?

"A. No, he pulled it out of his hoody pocket right before he used it.

"Q. Did anyone else have a gun?

"A. No, not that I know of.

"Q. How long have you known Shawn?

and had their backs to him, and that he could not see each of the men clearly. He stated that he had known what the defendant looked like when the shooting

"A. A few years.

"Q. Where is he staying now?

"A. Somewhere across from building ten, one of the complexes.

"Q. Who is Jerry Fleming?

"A. I know him about five or six years, dark skinned, about five foot two inches, about medium build, he is only about sixteen, seventeen. He lives by the first parking lot.

"Q. Do you remember what he was wearing last night?

"A. No.

"Q. Where did you go after the shooting?

"A. Back into my friends house, 3410 Trumbull Avenue. I stayed there for awhile.

"Q. Do you know Fats real name?

"A. No.

"Q. What's he look like?

"A. Lighter skinned than me and Shawn, no older than eighteen, kinda heavy, Shawn's brother, he's always got a hat on and he's about five foot ten inches, I guess.

"Q. How about Major, do you know his real name?

"A. I don't know, I really don't know nothing about him, I only seen him around once in awhile.

"Q. Rodney, I'm going to show you a photo array consisting of six black males; do you recognize any of them?

"A. Yes, number two.

"Q. Who is number two?

"A. Shawn Newsome, the one who shot Lorenzo last night. . . .

"Q. Are you positive also that a Jamont Best was not out there last night?

"A. No, I just didn't see him if he was.

"Q. Describe the blue car that Shawn got into after the shooting?

"A. Dark blue, dark tint on the window, it's in good condition, a Regal.

"Q. Do you know why they all jumped on Lorenzo?

"A. There was no reason . . . .

"Q. Is that the reason Shawn shot him?

"A. I don't know they were all drunk.

"Q. I'm going to show you another photo array consisting of six black males; do you recognize any of them?

"A. Yes, number four.

"Q. Who is that?

"A. That's Jerry Fleming.

"Q. What did he do during the shooting last night?

"A. He was just part of the fight before Shawn shot.

"Q. Also please sign the backs of the two photos you identified.

"A. Okay.

occurred and that he had not seen the defendant in the group of men fighting with the victim. On redirect examination, however, Womble testified that the defendant had been involved in the fight with the victim prior to the shooting. He further indicated that he had lied to DeSarli when he had given her his statement because he had wanted to leave the police station as quickly as possible.

As we previously noted, the sufficiency of a prior inconsistent statement to support a conviction depends on its reliability, which is tested by examination of the statement itself and by the totality of the other evidence in the record, including the explanation of the witness who purportedly made the statement. In reviewing the sufficiency of the evidence to support a criminal conviction "we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Greenfield,* 228 Conn. 62, 76, 634 A.2d 879 (1993)." (Internal quotation marks omitted.) *State* v. *Mejia,* supra, 233 Conn. 223.

---

"Q. Also would you sign and date and circle the photo copies of the array?

"A. Yes.

"Q. Was Lorenzo with anyone?

"A. His brother but he ran away before he got shot, his brother's name is Ricky Sheppard.

"Q. Have you seen Shawn, Jerry, Fats or Major since last night?

"A. No. I just came out when you saw me.

"Q. Do you have anything further you would like to add to this statement?

"A. No.

"Q. After reading this statement and finding it to be as you have told me, will you sign it?

"A. Yes.

"Ended 14:30 hours. Signed Rodney Womble. Witnessed Detective L.A. DeSarli, subscribed and sworn before me the fifth day of March, 1992, under

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. *State* v. *Castonguay*, 218 Conn. 486, 507, 590 A.2d 901 (1991). If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. *State* v. *Grant*, 219 Conn. 596, 604–605, 594 A.2d 459 (1991)." (Internal quotation marks omitted.) *State* v. *Pinnock*, 220 Conn. 765, 771, 601 A.2d 521 (1992). "[W]e must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Mejia*, supra, 233 Conn. 224. In the present case, we are persuaded that the jury reasonably could have found that Womble had told the truth in his out-of-court statement and could have concluded beyond a reasonable doubt from the evidence presented at trial that the defendant had intentionally murdered the victim.

In evaluating the evidence before it, the jury was required, primarily, to assess the credibility of Womble and to determine which, if either, of his statements concerning the shooting of the victim was truthful. The jury had the opportunity to observe Womble when he testified as to his knowledge of the identity of the shooter and his explanation of his prior identification of

authority of the Connecticut General Statutes 1-24, Sergeant of the Police, Bridgeport police department."

the defendant. The jury reasonably could have rejected Womble's testimony to the effect that he had not seen the defendant shoot the victim and credited his statement to DeSarli in which he claimed that during the course of a fight between the victim and several young men, to which he was a witness, the defendant shot the victim at close range. We will not retry these credibility determinations on appeal. See *State* v. *Figueroa*, 235 Conn. 145, 179, 665 A.2d 63 (1995).

Moreover, we are persuaded that the jury reasonably could have concluded, on the basis of Womble's statement to DeSarli identifying the defendant as the shooter, that the defendant was guilty beyond a reasonable doubt. The statement possessed ample indicia of reliability. The statement was in writing, it was sworn and Womble admitted that it accurately represented the questions he had been asked and the answers he had given less than one full day after the shooting occurred. The statement describes the location and time of the incident, Womble's close proximity to it, and his familiarity with the victim and the defendant. Further, it describes in fair detail the altercation leading up to the shooting, the manner in which the shooting took place—including the specific area of the defendant's clothing from which he retrieved a gun and the point in the altercation at which he did so—and, finally, the defendant's actions immediately and sometime after the incident. Officer Daniels' testimony confirmed the time and location of the shooting and the departure of someone from the scene in an automobile moments after the shots were fired, which shots, it was confirmed, were fired by a .38 caliber gun. Moreover, the jury reasonably could have found that, at trial, Womble confirmed the account of the shooting he had given to DeSarli in virtually every respect, including the defendant's participation in the fight, except the identification of the defendant as the shooter. Further, DeSarli indi-

cated that Womble had expressed fear of retaliation for giving the police the information he possessed regarding the shooting, an obvious motive for recanting the key component of that information, the identity of the shooter. On this record, we conclude that there was sufficient evidence upon which the jury could have found the defendant guilty of murder beyond a reasonable doubt.

## C

The defendant claims, alternatively, that, even under the existing rule, the trial court improperly admitted Womble's statement into evidence at trial under *Whelan.* We disagree.

The defendant's claim in this regard requires little discussion. We note, without deciding whether it constitutes adequate briefing of this issue, that in support of this claim the defendant has simply invoked by reference his argument in support of his claim that Womble's statement was improperly admitted at the defendant's probable cause hearing. At trial, however, the defendant objected to the admission of Womble's statement solely on the ground that, because Womble had admitted on the stand to having made the statement to DeSarli, it was not inconsistent with his testimony.[8] As we noted

---

[8] The trial transcript reveals the following objection by the defendant to the admission of Womble's statement at trial.

"Defense Counsel: Your Honor, I would object to it being a prior inconsistent statement for this reason. The gentleman was just asked each and every time the State went to the statement and said, did you say this, did you say this, did you say this; he agreed that he said all the things that he said he said, so he's not denying that they were said, so the statement need not come in a[s] substantive evidence or even as a prior inconsistent statement. He's not denying having said it.

"The Court: I'm afraid it doesn't work that way. . . . Some of it can be prior inconsistent, but some of it is certainly under *Whelan* and I think that this is a *Whelan* statement and in its classical form. . . .

"Defense Counsel: Then may I go on the record, please, just take an objection to the Court allowing it in?

"The Court: Yes."

previously, "[o]ur review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection." (Internal quotation marks omitted.) *State* v. *Prioleau*, supra, 235 Conn. 310. For the same reasons that we decline to review the defendant's claim that Womble's statement was inadmissible in part I A of this opinion, we decline to review this ruling of the trial court.

## D

Finally, on the *Whelan* issue, the defendant also urges us, relying on *State* v. *Mancine*, supra, 124 N.J. 232, to "hone the *Whelan* doctrine" by adopting additional criteria, including a corroboration requirement, that must be satisfied before a prior inconsistent statement may be admitted at trial. The defendant also urges us, "in the interests of justice . . . to adopt a rule requiring 'special precautionary instructions' where the state's proof rests wholly or in large part on a 'recanted out-of-court prior inconsistent statement.' " Id., 246–47. We decline to impose additional requirements on the admissibility of a prior inconsistent statement or to devise "special" jury instructions to be given when such a statement is the primary or exclusive evidence relied upon by the state.

*Mancine* does not stand for the proposition that corroboration is essential to the proper admission of a prior inconsistent statement, as the court in that case specifically declined to so hold.[9] Instead, the court in

---

[9] The admissibility of prior inconsistent statements as substantive evidence is governed by rule 63 (1) (a) of the New Jersey rules of evidence, which provides: "A statement is admissible if previously made by a person who is a witness at a hearing, provided it would have been admissible if made by him while testifying and the statement:

"(a) Is inconsistent with his testimony at the hearing and is offered in compliance with Rule 22 (a) and (b); however, when the statement is offered by the party calling the witness it shall be admissible only if, in addition to the foregoing requirements, it (i) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its

*Mancine* held that "[a] prior inconsistent statement for which substantial evidence exists corroborating any of its specific elements and enhancing its reliability is corroborated in its entirety and may be used for all purposes." Id., 251. "For a statement that meets the requirements of [admissibility under New Jersey law] and one that . . . the court, in evaluating the . . . factors [that indicate the reliability of a prior inconsistent statement][10] finds by a preponderance of the evidence to be reliable, evidence directly or indirectly corroborative of the substantive facts is helpful but not necessary. A court should weigh substantive evidence found in a prior inconsistent statement on the same scale as any other evidence when determining whether sufficient evidence to support a guilty verdict exists." Id., 256.

While we agree with the court in *Mancine,* and with the defendant, that the numerous factors are relevant in assessing the probative value and reliability of a prior inconsistent statement, and are, therefore, appropri-

reliability or (ii) was given under oath subject to the penalty of perjury at a trial or other judicial, quasi-judicial, legislative, administrative or grand jury proceeding, or in deposition." See also *State* v. *Mancine,* supra, 124 N.J. 247.

[10] "Those factors are (1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion of giving the statement, (4) whether the declarant was then in custody or otherwise a target of the investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion [or a] summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducement or coercion for making the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability of the statement, and (15) the presence or absence of corroborating evidence." *State* v. *Mancine,* supra, 124 N.J. 248.

ately considered in evaluating the sufficiency of such evidence to support a conviction, we decline to impose specific criteria as components of a checklist that must be satisfied in each case in order to admit a prior inconsistent statement identifying the accused. We are satisfied that the requirements we imposed in *Whelan* adequately assure the reliability of prior inconsistent statements in order properly to put such a statement before the jury. In our view, the factors advanced by the defendant properly go to the weight to be afforded such a statement in light of the totality of the evidence adduced.

We also decline at this juncture to establish special jury instructions to be given when a prior inconsistent statement constitutes the primary or only evidence tending to identify the defendant as the perpetrator of the crime or crimes charged. Cf. *State* v. *Mancine*, supra, 124 N.J. 255 ("[s]pecial precautionary instructions should be given to the jury to emphasize the unusual care that must be taken before convicting a defendant of a particular offense based solely on a recanted out-of-court prior inconsistent statement"); id., 255–56 ("trial court's instruction, in specifically calling the jury's attention to the assessment of witnesses' prior inconsistent statements and their explanations, if any, for such contradictions as well as a consideration of a witness' interest in the outcome of the case, 'was generally sufficient to focus its attention on the need to be especially careful in assessing the believability and worth of [the witness'] prior statement' "). The defendant does not claim that the trial court improperly instructed the jury regarding its evaluation of the evidence before it and fails even to suggest the form that such "special instructions" should take. Accordingly, we decline to entertain this open request.

## II

The defendant next claims that the trial court abused its discretion when it denied his motion for a new trial

on the ground of juror misconduct. Specifically, he claims that the trial court improperly concluded that neither statements made by certain jurors regarding Womble's credibility nor the fact that one juror occasionally drove past the crime scene warranted a new trial. We disagree.

The following additional facts are relevant to our resolution of these claims. Subsequent to the return of the jury verdict, the defendant retained the services of a private investigator to interview the discharged jurors with respect to allegations of presubmission misconduct on the part of some jurors. On June 1, 1993, the defendant filed a motion for a new trial based on presubmission jury discussions and juror contact with the defendant's family during the trial.[11] On June 23, 1993, the trial court granted the defendant's motion for the appointment of a special public defender, James Ruane, for the limited purpose of the posttrial motion. On August 6, 1993, the special public defender filed another motion for a new trial and a motion for an evidentiary hearing on the defendant's motion for a new trial.

Thereafter, the trial court held an evidentiary hearing during which the private investigator's written reports were offered into evidence. On the basis of this evidentiary hearing, the trial court determined that it would hear testimony concerning the claims that certain jurors had engaged in presubmission discussions and that one juror had made an unauthorized visit to the crime scene. Ultimately, the court, utilizing the investigative report as its basis, personally questioned seven jurors and one alternate over the course of two days. Counsel were permitted to pose questions through the court. The testimony of these jurors can be summarized as follows.

---

[11] The defendant has not raised the matter of juror contact with his family as a subject of this appeal.

T,[12] an alternate juror, testified that she had heard remarks made concerning certain witnesses' credibility, including the credibility of Womble. She stated that, according to her recollection "[t]hings might have been discussed like this is ridiculous. This is a waste of time. You know, things like that." She further testified that a "few [jurors]," whom she identified as B and M had noted that certain witnesses were lying or changing their testimony, which conversation she thought had occurred at a lunch at which she was present.

N had no recollection of any presubmission discussion of the evidence. She did, however, recall that one fellow juror, whom she identified as P, had commented that a female witness "looked like the type who do drugs."

K testified that she had neither participated in nor overheard any presubmission discussions regarding the credibility of witnesses. K confirmed, however, that on two or three occasions, on her normal route to the Trumbull Mall, she had passed by the crime scene but did not stop. She indicated that, while driving by, she had tried "to compare the photographs [in evidence] with . . . actually being there," but said that she had not done so in order to get a "better view of the evidence," but simply to see where the crime had been committed. She testified that her drives past the crime scene had not altered her thinking about the case in any way, and had not affected her verdict. She also stated that she had not communicated anything about her "driving by the scene" to any other juror.

P testified that he had overheard N and another juror, whom the court later determined to be the jury foreperson, B, make a few comments regarding one or more witnesses' clothing as well as the credibility of Womble

---

[12] In the interest of preserving the privacy of the jurors who served on this case, we refer to them by their initials.

because he had made inconsistent statements about the crime. With respect to the comment concerning the appearance of a female witness attributed to him by N, P denied that he had made that statement to any other juror and claimed that he had only mentioned it to the investigator.

Another juror, M, testified that he had overheard some presubmission discussion of witness credibility and some comments about the "jail clothes" worn by some witnesses. Referring specifically to Womble, M testified that one juror had commented that "[some witnesses] obviously were lying" and "[h]ow do you believe these people?"

L stated that he had only overheard presubmission discussion regarding the prison clothing of certain witnesses.

B, the jury foreperson, denied that she had instigated or participated in presubmission discussions regarding the credibility of any witness. She did state, however, that, at one lunch break, she overheard some jurors comment on the credibility of witnesses but that she immediately put a halt to such discussions. She added that, "[o]utside [the jury deliberation room] nothing was discussed pertaining to the case, the witnesses. So this all comes as news to me."

In a comprehensive memorandum of decision, the trial court reviewed the defendant's claims and concluded, on the basis of its review of the evidence presented at trial and its evaluation of the testimony of the jurors, that neither comments made by jurors regarding Womble's credibility nor K's drives past the crime scene had prejudiced the defendant and, further, that the claimed juror misconduct was harmless beyond a reasonable doubt.

With regard to presubmission discussions concerning Womble's credibility, the trial court noted that "[b]asic

to the theory of both the state's case and the defense case, was the fact that Womble changed his testimony. Both sides conceded he was a liar." The court found that any comments made by the jurors regarding Womble simply mirrored this view of the case, namely, that Womble had told two different stories about the shooting and was, therefore, a liar. Further, the court found that such comments had been limited to a few jurors and that there had been little or no discussion surrounding these comments. The court concluded that the discussion that had taken place about Womble "did not damage the defendant since it was totally compatible with the presentation of both sides," having "merely repeated what both counsel contended in the assertion of their strategies," i.e., that Womble was a liar.

Further, the trial court found significant that "every juror interviewed by the defendant's investigator and every juror interrogated by the court (including those who admitted they had made comments) made it clear that there was no prejudgment of the defendant's guilt or innocence by *any* jurors." The court expressly found the jurors' testimony in this respect credible and concluded that, "[w]hatever was said, there is no evidence it compromised the jury in any way."

With regard to the defendant's claim that K's drives past the crime scene were improper and had prejudiced his right to a fair trial, the trial court found that: (1) "[t]he juror did not go to the scene to get information, as alleged by the defendant"; (2) the juror's drives past the crime scene were a part of "routine trips" to the Trumbull Mall; and (3) the juror did not discuss her drives past the crime scene with other jurors. The trial court concluded that "[the juror] saw nothing that altered or affected her opinion about the case that was based on the evidence under oath," and, accordingly, that there was no prejudice to the defendant regardless of which party had the burden of proving or disproving

the same. The trial court, therefore, denied the defendant's motion for a new trial.

A defendant is entitled to have an impartial jury decide his case "solely on the basis of the evidence and arguments given them in the adversary arena after proper instructions on the law by the court." *State* v. *Rodriguez*, 210 Conn. 315, 325, 554 A.2d 1080 (1989). "[I]t is improper for jurors to discuss a case among themselves until all the evidence has been presented . . . and the case has been submitted to them after final instructions by the trial court. *State* v. *Washington*, 182 Conn. 419, 425, 438 A.2d 1144 (1980); 89 C.J.S., Trial §§ 457 (e) and 460 (b); 75 Am. Jur. 2d, Trial § 994." *State* v. *McCall*, 187 Conn. 73, 76, 444 A.2d 896 (1982). When "jurors . . . discuss the case among themselves, either as a whole or in groups, [prior to formal deliberations they] . . . give premature consideration to the evidence presented—consideration unaided by the final instructions of the trial court as to the law to be applied to the facts in the case." *State* v. *Washington*, supra, 426. In this regard, we have expressed our concern that "it is human nature that an individual, having expressed in discussion his or her view of the guilt or innocence of the defendant, would be inclined thereafter to give special attention to testimony strengthening or confirming the views already expressed to fellow jurors." Id. "Also, the human mind is constituted so that what one himself publicly declares touching any controversy is much more potent in biasing his judgment and confirming his predilections than similar declarations which he may hear uttered by other persons. When most men commit themselves publicly to any fact, theory, or judgment they are too apt to stand by their own public declarations, in defiance of evidence." (Internal quotation marks omitted.) Id.

It is well established, however, that not every incident of juror misconduct requires a new trial. See *United*

*States* v. *Klee*, 494 F.2d 394, 396 (9th Cir.), cert. denied, 419 U.S. 835, 95 S. Ct. 62, 42 L. Ed. 2d 61 (1974); *State* v. *Asherman*, 193 Conn. 695, 736, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). The question is " 'whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial.' " *State* v. *McCall*, supra, 187 Conn. 77, quoting *United States* v. *Klee*, supra, 396. The defendant has been prejudiced if " 'the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror.' " *Williams* v. *Salamone*, 192 Conn. 116, 122, 470 A.2d 694 (1984). "We have previously held that, in cases where the trial court is directly implicated in juror misconduct, the state bears the burden of proving that misconduct was harmless error. *State* v. *Castonguay*, 194 Conn. 416, 435, 481 A.2d 56 (1984); *Aillon* v. *State*, [168 Conn. 541, 548, 363 A.2d 49 (1975)]." *Asherman* v. *State*, 202 Conn. 429, 442, 521 A.2d 578 (1987). Where, however, "the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct. *State* v. *Castonguay*, supra, 435–36 n.19; *State* v. *Almeda*, 189 Conn. 303, 313, 455 A.2d 1326 (1983); see *Smith* v. *Phillips*, 455 U.S. 209, 215, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)." *Asherman* v. *State*, supra, 442.

"A motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds." *State* v. *Asherman*, supra, 193 Conn. 735. "In our review of the denial of a motion for mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on

appeal only if there has been an abuse of discretion. *State* v. *Marra*, 215 Conn. 716, 732, 579 A.2d 9 (1990); *State* v. *Cruz*, 212 Conn. 351, 364, 562 A.2d 1071 (1989); *State* v. *Fleming*, 198 Conn. 255, 264, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986)." *State* v. *Famiglietti*, 219 Conn. 605, 616, 595 A.2d 306 (1991); see also *State* v. *Hammond*, 221 Conn. 264, 270, 604 A.2d 793 (1992); *State* v. *Rodriguez*, supra, 210 Conn. 326.

A

The defendant first argues that once a criminal defendant has established that presubmission discussion has occurred regarding a "key" issue in the case such as the credibility of Womble, prejudice must be presumed and a new trial is automatically required. In essence, the defendant argues that such conduct on the part of the jury cannot, as a matter of law, be found to be harmless. We disagree.

We have previously recognized that, even if presubmission discussion has been invited by the trial court, the state may attempt to demonstrate that the error was harmless beyond a reasonable doubt. See *State* v. *Washington*, supra, 182 Conn. 429; see also *State* v. *Castonguay*, supra, 194 Conn. 436 (rejecting defendant's claim that trial court's instruction that jurors may discuss evidence prior to deliberation automatically requires new trial). Likewise, the state is permitted to attempt to demonstrate the harmlessness even of certain types of jury misconduct that is deemed "presumptively prejudicial because [such conduct] implicates [a] defendant's constitutional right to a fair trial before an impartial jury." *State* v. *Asherman*, supra, 193 Conn. 736. Moreover, we have acknowledged that "where . . . there has been no authorization [by the trial court of presubmission discussion of the evidence] a discussion among jurors prior to the trial charge has been

held not to be fatal." *State* v. *McCall*, supra, 187 Conn. 77. We decline to abrogate our longstanding approach to the issue of juror misconduct by carving out an automatic reversal rule for a particular category of presubmission discussion, namely discussion of a "key issue" or a key witness' credibility. In our view, the materiality of an issue found to have been discussed prior to deliberation is properly considered, along with nature of that discussion, in making the ultimate determination whether the discussions prejudiced the defendant.

Alternatively, the defendant argues that, in the circumstances of this case, the trial court improperly concluded that the state had demonstrated beyond a reasonable doubt that the presubmission discussion concerning Womble's credibility was harmless. We disagree. Even if we were to assume, without deciding, that it was the state's burden to prove that the discussion regarding Womble's credibility was harmless; but see *State* v. *Asherman*, supra, 193 Conn. 736–37 (suggesting that where juror misconduct complained of was not invited by trial court and is not type of misconduct that implicates defendant's right to fair trial, it is defendant's burden to show harm); we conclude on the record before us that the trial court properly found that the challenged presubmission discussions were harmless beyond a reasonable doubt.

It is undisputed that presubmission discussion of the evidence by jurors in any degree is not an acceptable practice and constitutes misconduct. See *State* v. *McCall*, supra, 187 Conn. 73; *State* v. *Washington*, supra, 182 Conn. 419. Here, certain jurors did breach their sworn duty by discussing the credibility of Womble. "In determining the 'nature and quality' of the 'misconduct' [however] we must be mindful that the concerns underlying *Washington* were not simply that the jurors may have discussed the evidence pre-submission, but that they may have taken positions on the evidence." *State*

v. *Castonguay*, supra, 194 Conn. 437. The trial court found, and the record supports the finding, that the presubmission discussions focused on the fact that, from the time of his pretrial statement to the time of trial, Womble changed his story concerning the defendant's involvement in the crime. Implicit in the trial court's findings, and also supported by the record, is that there was no indication that the jurors had expressed any opinion as to which, if either, of Womble's accounts of the shooting was truthful or whether the defendant was guilty. Thus, although improper, the remarks were limited in scope and did not result in any juror committing himself or herself to a position on the evidence, the primary danger associated with jurors' presubmission discussion of the evidence or issues in the case. See *State* v. *Washington*, supra, 427.

Further, the trial court found it significant that the jurors expressly disclaimed that they had prejudged the defendant's guilt or innocence or that any remarks concerning Womble's credibility had influenced their decisions. In this regard, the defendant argues that "jurors are not competent to testify to the effect of their misconduct on their final decision" and, therefore, that the "jurors' denials of prejudgment here should carry no weight." We disagree. "We are not inclined to disregard the statements of those jurors interviewed as 'inevitably suspect.' " *State* v. *Rodriguez*, supra, 210 Conn. 330. " 'One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.' But in such an inquiry, which is essentially factual, the trial court that conducts it is in the best position to assess the testimony of those on the jury panel, including its impact on the fairness of the trial, and its conclusion is entitled to 'substantial weight.' " Id.

In light of the trial court's findings, which are supported by substantial evidence in the record, that comments relating to Womble's credibility were limited to recognition of the view, stressed by counsel for both the state and the defendant, that Womble had told two different stories about the crime; were few in number; were made or heard only by a small minority of the jurors and alternates; and, further, that there was no indication that the challenged comments either influenced the jurors' deliberations or prejudiced them against the defendant, we conclude that the trial court properly determined, beyond a reasonable doubt, that the comments had not prejudiced the defendant's right to a fair trial and, therefore, that the trial court did not abuse its discretion in denying the defendant's motion for a new trial on this basis.

## B

We turn finally to the defendant's last claim, based on much the same analysis and argument as the previous claim, that the trial court improperly determined that a new trial was not required because a single juror had driven past the murder scene on a few occasions and allegedly had compared photographic evidence at trial to what she observed during those occasions. Employing, without repeating the same scope of review and standards concerning jury misconduct against which we measured the previous claim, we reject the defendant's contention.

Our review of the record reveals that no other juror testified that K had spoken of her drives past the murder scene, and that there is no indication that these occurrences resulted in any prejudgment of the case by K or any prejudice to the defendant. A new trial is not warranted merely because one member of the jury, in violation of the trial court's instructions, drove past the scene of the homicide if there is no proof that the

juror did so for the purpose of evaluating the evidence, conversed with other jurors about the case or was influenced by the incidents. See annot., 58 A.L.R. 2d 1155–57 (1958) (listing cases involving harmless views of crime scene by jurors). Here, even if we were to assume, arguendo, that K's actions were misconduct, we are persuaded that they did not prejudice the defendant's right to a fair trial. "If a verdict should be set aside merely because of an unauthorized visit by the jury to the place of the crime, without proof of something to show a tendency to prejudice the defendant, [it would follow that] when the offense was charged to have been committed, for instance, in the business district around the courthouse square of a county seat, the jury would have to be consigned to a dungeon to consider its verdict, lest it might accidently see from the courthouse window some locality mentioned in the testimony." *People* v. *Strause*, 290 Ill. 259, 281, 125 N.E. 339 (1919).

The judgment is affirmed.

In this opinion PETERS, C. J., and CALLAHAN and KATZ, Js., concurred.

BERDON, J., dissenting. The only evidence identifying the defendant, Shawn Newsome, as the individual who fatally shot the victim was Rodney Womble's prior inconsistent extrajudicial statement. In my view, this is insufficient evidence upon which to rest a conviction for murder.

As the majority recounts, Womble gave a statement to the police identifying the defendant as the individual who shot the victim. Subsequently, at both the probable cause hearing and the trial, while under oath and subject to immediate cross-examination, Womble recanted his prior statement and testified that he was unable to identify the individual who had shot the victim. He testified that his prior statement was based not on what he had

personally witnessed, but on what he had heard from other individuals. Pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), Womble's extrajudicial statement was admitted for substantive purposes. No other evidence was admitted relating to the identity of the assailant.

Although I agree that Womble's statement was properly *admitted* for substantive use, the evidentiary foundation upon which the defendant's conviction rests is insufficient to sustain the verdict. *State* v. *Cobbs*, 203 Conn. 4, 13, 522 A.2d 1229 (1987) (insufficient evidence to prove defendant's guilt beyond reasonable doubt). For the first time, this court today affirms a criminal conviction that rests solely on an uncorroborated inconsistent statement, which was not subject to contemporaneous cross-examination. Previously, in both *State* v. *Borrelli*, 227 Conn. 153, 629 A.2d 1105 (1993), and *State* v. *Hopkins*, 222 Conn. 117, 609 A.2d 236 (1992), there was ample independent evidence that corroborated the respective witnesses' extrajudicial statements. Indeed, in *State* v. *Hopkins*, supra, 123–24, we recognized that "[c]ommentators have pointed out that 'the court should require some corroborative evidence and not permit a conviction to be based solely on an out-of-court inconsistent statement [of a nonparty witness]. See *State* v. *DeFreitas*, 179 Conn. 431, 426 A.2d 799 (1980) (declaration against penal interest); see also *Commonwealth* v. *Daye*, [393 Mass. 55, 469 N.E.2d 483 (1984)].' C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1991 Sup.) § 11.24.1, p. 122."[1]

In *Hopkins*, the defendant was convicted of felony murder. Admitted at trial as substantive evidence was

---

[1] In the 1995 supplement to his treatise, Professor Tait deleted from § 11.24.1 his reference to *Daye*, and instead cited *Hopkins*, along with *DeFreitas*, as authority for the proposition that a conviction should not be based solely on an out-of-court inconsistent statement.

an extrajudicial statement made by the defendant's wife identifying the defendant as the individual responsible for the fatal shooting of the victim. At trial, however, the witness testified that she could not identify the assailant. "Nevertheless, [as this court observed] this is not a case in which the only evidence of guilt was the uncorroborated and unsworn out-of-court statement of [one witness]. In addition to [the witness'] statement to the police, all her sworn testimony from the probable cause hearing was admitted into evidence at trial *without objection* on the part of the defendant. The testimony at the probable cause hearing was subject to contemporaneous cross-examination by the defendant. Although [the witness] vacillated during cross-examination between identifying the defendant as the perpetrator and stating only that the assailant had been one of two black males whom she could not identify, on direct examination, she clearly implicated the defendant under oath as the person who had shot [the victim]." (Emphasis in original.) *State* v. *Hopkins*, supra, 222 Conn. 124.

Similarly, in *State* v. *Borrelli*, supra, 227 Conn. 160, "there was ample corroborative evidence . . . ." In *Borrelli*, the victim provided a statement to the police identifying the defendant, her husband, as the individual who had assaulted her. "At the hearing on the motion to dismiss, the victim testified that the events alleged in her statement had not happened. At trial, she again recanted. During cross-examination by the defendant at trial, she testified for the first time that it was actually she who had tied up and physically abused the defendant. She also testified that she had made up her initial story in the hopes that the defendant would be arrested and given drug treatment." Id., 157–58. The witness' extrajudicial statement, however, was corroborated by physical marks of abuse upon her person that were seen and testified to by the police officer who had taken

her initial statement. Id., 160–61. Moreover, the officer had accompanied the witness to her house where the officer viewed other physical evidence that was consistent with the witness' statement. Id., 161.

Several courts have recognized the danger in permitting a criminal conviction to rest solely upon a prior inconsistent statement. In 1979, the United States Court of Appeals for the Sixth Circuit noted that "*California* v. *Green*, 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970), established that the use of a prior inconsistent statement as substantive evidence does not necessarily violate the Confrontation Clause, so long as the witness who had made the statement is present and available for questioning at trial. . . . The opinion in [*Green*] ended with a strong hint that such statements, though constitutionally admissible, nevertheless may not be sufficient, by themselves, to sustain a conviction. . . . [Prior inconsistent statements][2] may be used to corroborate evidence which otherwise would be inconclusive, may fill in gaps in the Government's reconstruction of events, or may provide valuable detail which would otherwise have been lost . . . . But the Government having offered such statements as the sole evidence of a central element of the crime charged, we hold that the Government has failed to sustain its burden of proving guilt beyond a reasonable doubt." *United States* v. *Orrico*, 599 F.2d 113, 118–19 (6th Cir. 1979). Five years later, the Supreme Judicial Court of Massachusetts held that "we will not permit convictions based exclusively on inconsistent extrajudicial testimony to stand," especially in regard to the question of identification. *Commonwealth* v. *Daye*, supra, 393 Mass. 74. Soon thereafter, citing to *Orrico*, the Supreme Court of Florida, "[held], as a matter of law, that in a criminal prosecution a prior inconsistent statement standing alone is

---

[2] The extrajudicial statement at issue in *United States* v. *Orrico*, 599 F.2d 113, 115 (6th Cir. 1979), was admitted as a past recollection recorded.

insufficient to prove guilt beyond a reasonable doubt." *State* v. *Moore*, 485 So. 2d 1279, 1281 (Fla. 1986).

One commentator, who has examined this precise issue, has suggested that before a conviction may rest solely on a prior inconsistent statement, the "statement must be made at a time when the declarant was subject to some form of cross-examination by the defendant *and* there must be a reasonable factual basis in the record for a trier of fact to credit the prior statement over the present in-court testimony . . . ." (Emphasis in original.) S. Goldman, "Guilt by Intuition: The Insufficiency of Prior Inconsistent Statements To Convict," 65 N.C. L. Rev. 1, 44 (1986).[3]

In this case, Womble's extrajudicial statement was not subject to contemporaneous cross-examination by the defendant, nor was there any independent evidence to corroborate the substance of the statement. Consequently, there was insufficient evidence to find the defendant guilty of murder beyond a reasonable doubt.

Accordingly, I dissent.

---

[3] In his article, Professor Goldman noted that "most state courts have tended to equate [inappropriately] sufficiency [of prior inconsistent statements to convict] with admissibility," and concluded that convictions resting solely on prior inconsistent statements raise serious due process and confrontation issues. S. Goldman, supra, 65 N.C. L. Rev. 24, 29–38.